**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION – BOSTON**

| | |
|---|---|
| HBM Holdings Limited and Harbour Antibodies U.S. Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> Weihao Xu, <br><br> Defendant | Case No. 1:24-cv-12724-PBS <br><br> **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS AND REQUEST FOR ORAL ARGUMENT** |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

RELEVANT LEGAL STANDARDS ............................................................................. 2

ARGUMENT ................................................................................................................... 2

    A.  The Court Should Reject Xu's Attempt to Introduce Extrinsic Evidence. ........................... 3

    B.  Harbour BioMed Has "Standing" to Bring the Causes of Action in the Complaint ............ 5

    C.  Harbour Antibodies has "Standing" to Bring This Action. .................................................. 6

    D.  Harbour Has Pled a Valid Cause of Action for Breach of Xu's Fiduciary Duties. ............. 8

    E.  Harbour Has Pled a Valid Breach of Contract Claim Against Xu ..................................... 11

    F.  Harbour Has Pled a Valid Cause of Action Against Xu for Interference with Advantageous Economic Relationships ............................................................................. 13

    G.  Harbour Has Pled a Valid Claim Against Xu for Fraud. ................................................... 16

    H.  Harbour Has Sufficiently Pled Xu's Violation of the Defend Trade Secrets Act ............. 17

REQUEST FOR ORAL ARGUMENT ........................................................................ 20

CONCLUSION ............................................................................................................. 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*477 Harrison Ave., LLC v. JACE Bos., LLC*, 134 N.E.3d 91 (2019) ............................................13

*Allied Waste Services of North America, LLC v. Tibble*,
177 F.Supp.3d 1103 (N.D. Ill. 2016) .......................................................19

*Antrim Pharm. LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934 (N.D. Ill. 2018) ...........................14

*Aon PLC v. Infinite Equity, Inc.*,No. 19 C 7504,
2021 U.S. Dist. LEXIS 175378 (N.D. Ill. Sep. 15, 2021) .....................................19

*API Ams., Inc. v. Miller*, 380 F. Supp. 3d 1141 (D. Kan. 2019).................................................9, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).........................................................2

*Balles v. Babcock Power Inc.*, 476 Mass. 565, 70 N.E.3d 905 (2017).........................................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................2

*Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310 (D. Mass. 2022)..................................................4, 7

*Blackstone* v. *Cashman*, 448 Mass. 255, 860 N.E.2d 7 (2007) ......................................13

*Collins v. Huculak*, 57 Mass. App. Ct. 387, 783 N.E.2d 834 (2003)............................................17

*Cueroni v. Coburnville Garage, Inc.*, 315 Mass. 135, 52 N.E.2d 16 (1943)..............................13

*Doe v. Wentworth Inst. of Tech., Inc.*, Civil Action No. 1:21-cv-10840-ITYY,
2022 U.S. Dist. LEXIS 99326 (D. Mass. June 3, 2022) ............................................5

*Dow v. Casale*,  31 Mass. L. Rep. 92 (2013) .......................................14

*G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96 (D. Mass. 2023)............................................18

*Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 705 N.E.2d 279 (1989)..............................11

*Hullum v. Mici*, No. 23-10082-PBS,
2024 U.S. Dist. LEXIS 134146 (D. Mass. July 30, 2024).........................................5

*Kando v. R.I. State Bd. of Elections*, 880 F.3d 53 (1st Cir. 2018) .....................................2

*King* v. *Driscoll*, 418 Mass. 576 (1994).........................................................15

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, Civil Action No. 21-10572-MRG,
2024 U.S. Dist. LEXIS 65395 (D. Mass. Apr. 10, 2024) .......................................20

*Llorens v. LexShares, Inc.*, Civil Action No. 24-cv-12452-PBS,
    2024 U.S. Dist. LEXIS 218211 (D. Mass. Dec. 3, 2024) ........................................................2

*Puritan Med. Ctr. v. Cashman,* 596 N.E.2d 1004 (1992) ..............................................................10

*Singarella* v. *Boston*, 342 Mass. 385, 173 N.E.2d 290 (1961) .....................................................11

*Skyview Fin. Co., LLC v. Kearsarge Trading, LLC*, Civil Action No. 20-11666-PBS,
    2021 U.S. Dist. LEXIS 92911 (D. Mass. Feb. 24, 2021) .................................................2, 3, 4

*Stokes v. Saga Int'l Holidays, Ltd.*, 218 F.R.D. 6 (D. Mass. 2003) ...............................................2

*T.H. Glennon Co. v. Monday*, No. 18-30120-WGY,
    2020 U.S. Dist. LEXIS 45917 (D. Mass. Mar. 17, 2020) .......................................................18

*Trowt v. Silva*, Nos. 129018, ESCV201101279,
    2014 Mass. Super. LEXIS 195 (Oct. 31, 2014) ....................................................................10

## Other Authorities

FRCP 8 ...........................................................................................................................................16

FRCP 9 ...........................................................................................................................................17

FRCP 12(b)(6) ........................................................................................................................1, 2, 3

FRCP 12(d) ......................................................................................................................................5

## INTRODUCTION

Plaintiffs HBM Holdings Limited ("Harbour BioMed") and Harbour Antibodies U.S. Inc. ("Harbour Antibodies") (collectively, "Harbour") filed a Complaint alleging five causes of action: Breach of Fiduciary Duties – Duty of Loyalty; Breach of Contract; Interference with Advantageous Economic Relationships; Fraud; and Violation of the Defend Trade Secrets Act ("DTSA").

Defendant Weihao Xu ("Xu") filed a Motion to Dismiss all of the causes of action pursuant to FRCP 12(b)(6) (the "Motion"), alleging that Plaintiffs have failed to state a claim because (1) certain of the Plaintiffs do not have "standing" to pursue certain of the claims, and (2) certain "facts" and documents (that fall well outside of the Complaint) defeat Plaintiffs' claims. The Motion fails for several independent reasons.

*First*, the Complaint alleged – and the documents on which Xu himself relies show – that Xu held several positions with different Harbour entities, all of which are directly or indirectly wholly-owned subsidiaries of Harbor BioMed.  Accordingly, Harbor BioMed does have "standing" to pursue claims for breach of fiduciary duty and breach of contract, in addition to the other claims.  *Second*, while Harbour Antibodies may not directly own the Assets at issue, Plaintiffs allege that Harbour Antibodies was involved in the negotiations as Xu's direct employer, and it is wholly-owned by Harbour BioMed.  When Xu elevated his own interests over the interests of his employers and their affiliates, both Plaintiffs were damaged, which gives them "standing" to bring the claims relating to the Assets. *Third*, Xu raises numerous alleged factual disputes, but it is black letter law that those are not properly considered on a Rule 12(b)(6) motion.  *Fourth*, with respect to each cause of action, Harbour has alleged facts that amply demonstrate the plausible claim and entitlement to relief required for notice pleading, and Xu has not otherwise demonstrated that Harbour fails to state a claim with respect to any of the claims.  For all of the foregoing reasons, as further detailed below, the Motion should be denied in its entirety.

1

## RELEVANT LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must allege a plausible entitlement to relief." *Llorens v. LexShares, Inc.*, Civil Action No. 24-cv-12452-PBS, 2024 U.S. Dist. LEXIS 218211, at *4-5 (D. Mass. Dec. 3, 2024) (quotations omitted) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007)). In evaluating a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true, *see id.* (citing *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018)), and "all reasonable inferences that might be drawn from them are indulged in favor of the pleader," *Stokes v. Saga Int'l Holidays, Ltd.*, 218 F.R.D. 6, 8 (D. Mass. 2003). As long as the factual allegations "permit [the Court] to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Llorens*, 2024 U.S. Dist. LEXIS 218211, at *5 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), a Rule 12(b)(6) motion must fail. In other words, a Rule 12(b)(6) motion may only be granted where it is "clear that no relief could be granted under any set of the facts that could be proved consistent with the allegations." *Stokes*, 218. F.R.D. at 8.

"Generally, the Court cannot consider documents outside the scope of the complaint on a motion to dismiss. However, the Court may consider documents extrinsic to the complaint if the documents are not disputed by the parties, or if the documents are 'official public records; . . . documents central to the plaintiff's claim; or . . . documents sufficiently referred to in the complaint.' In considering extrinsic documents, the Court will not assume the truth of the contents but will merely take into consideration the existence of the documents." *Skyview Fin. Co., LLC v. Kearsarge Trading, LLC*, Civil Action No. 20-11666-PBS, 2021 U.S. Dist. LEXIS 92911, at *6-7 (D. Mass. Feb. 24, 2021) (internal citations and quotations omitted, ellipses in original).

## ARGUMENT

Xu's Motion merely challenges the factual allegations in the Complaint and serves as a vehicle through which he seeks to tell his side of the story. There is a time and place to do that in

a lawsuit, but it is not in a Rule 12(b)(6) motion. Xu does not address the only pertinent question in such a motion: whether, accepting the facts as true, Harbour stated a claim under any set of facts that could be proved consistent with the allegations contained in the Complaint. Because the answer to that question is "Yes," the Court should deny the Motion in its entirety.

A. **The Court Should Reject Xu's Attempt to Introduce Extrinsic Evidence.**

The Employment Offer Letter and the "Employee Proprietary Information, Inventions, Non-competition and Non-Solicitation Agreement" (the "NDA") (Dkt. 18-2, Xu's Ex. 1) were referenced in the Complaint and are sufficiently central to Harbour's claims to permit the Court's consideration of them in connection with the Motion. All of the other documents Xu included with his Motion in an attempt to make an improper factual showing (Dkt. 18-3 - Dkt. 18-8, Xu's Ex. 2-7) must be disregarded. *See Skyview Fin. Co.*, 2021 U.S. Dist. LEXIS 92911, at *6-7.

By way of example, citing to Paragraph 7 of the Complaint (Dkt.1, which states: "As is often the case, the emails tell the story."), Xu attempts to introduce several email messages and attachments, none of which are referenced in or central to Harbour's claims. But a generalized statement relating to Xu's attempt to delete emails in his Harbour account after his termination does not provide a sufficient basis to allow Xu to introduce all emails that he believes may tend to disprove Harbour's claims. Indeed, a similar attempt to introduce emails and documents was previously denied by this Court in another case:

> Kearsarge's e-mails go beyond the scope of the narrow central to the claim exception: They raise factual issues … .

> Kearsarge points out that the Court may consider documents extrinsic to the complaint on a motion to dismiss if the complaint refers to the documents. *See Alt. Energy, Inc.,* 267 F.3d at 33 (quoting *Watterson*, 987 F.2d at 3. Under this theory, Kearsarge asks the Court to consider, among other documents, a four-page letter detailing Kearsarge's concerns regarding Skyview's performance.

3

> In its complaint, Skyview mentions this August 7, 2020 letter only to establish when Kearsarge sent its intent to repudiate. The only e-mail that Skyview quotes extensively from in its complaint is from August 4, 2020, but that e-mail was not produced by Kearsarge. … Beyond that, Skyview's complaint provides little more than a summary of the parties' communications between June and August of 2020. Accordingly, because no valid exceptions apply, the Court will not consider Kearsarge's extrinsic documents on a motion to dismiss.

*Skyview Fin. Co.*, 2021 U.S. Dist. LEXIS 92911 at *7-8. Likewise, several of Xu's exhibits, such as the Scientific Advisor Agreement (Dkt. 18-5) and the Mutual Confidentiality Agreement (Dkt. 18-6), were not mentioned or even tangentially referred to in the Complaint and must be excluded.[1]

Moreover, even if it were proper for the Court to consider Xu's Exhibits – and it is not – they cannot be used to support Xu's Motion because they have not been authenticated. Introduction of the documents would require an affidavit or declaration made by someone with personal knowledge of them. *See, e.g., Doe v. Wentworth Inst. of Tech., Inc.*, Civil Action No. 1:21-cv-10840-ITYY, 2022 U.S. Dist. LEXIS 99326, at *3 n.1 (D. Mass. June 3, 2022) ("On a motion to dismiss, … the court excludes the outside material where a summary judgment motion would be premature and Wentworth has not provided any authentication, such as by affidavit, that the untitled document is in fact Wentworth's 2019-2020 Code of Conduct … .").

Lastly, and as discussed below in relation to each of the causes of action, even if the Court were to consider Xu's Exhibits (and again, it should not do so), the Motion still must be denied.[2]

---

[1]  Additionally, while the Term Sheet (Dkt. 18-3, Xu's Ex. 2) was referenced in the Complaint to assist in explaining Xu's improper actions and Harbour's measure of damages, it does not form the basis of any cause of action and must also be excluded from consideration.

[2]  Alternatively, if this Court determines that any additional facts or exhibits should be considered, Harbour respectfully requests that it be afforded an opportunity to further brief those issues under the summary judgment standard and to provide additional evidence as necessary. *See, e.g.*, *Hullum v. Mici*, No. 23-10082-PBS, 2024 U.S. Dist. LEXIS 134146, at *1-4 (D. Mass. July 30, 2024) (citing FRCP 12(d): "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion

**B.  Harbour BioMed Has "Standing" to Bring the Causes of Action in the Complaint.**

Xu alleges he was employed only by Harbour Antibodies and the Complaint does not reference employment by any other party.  *See* Dkt. 18 at p. 2, 6.  However, the Employment Offer Letter (which was quoted in and is central to the Complaint) expressly states:  "We are pleased to confirm this offer of employment of you to be the Chief Strategy Officer of Harbour Biomed (HBM)."  *See* Xu's Ex. 1, Dkt. 18-2 at p. 1 ("As the Chief Strategy Officer of HBM, you will report to Chief Executive Officer until further notice.").  The Employment Offer Letter then clarifies that because of Xu's physical location in the United States, his contract would be signed with Harbour Antibodies.  *See id.*  At best for Xu, there is a factual question as to his employment (which may be easily resolved by the explanation that Xu agreed to work for the parent company as well as its wholly-owned subsidiary, a common arrangement).  But that issue is something that must be addressed and resolved in the context of discovery, not on a motion to dismiss.[3]

The Complaint (Dkt. 1) also includes the following allegations, among others, all of which support the "standing" of Harbour BioMed to bring each of the causes of action against Xu:

- Harbour BioMed, a Cayman corporation, has a **U.S. business unit** that operates primarily in and around Boston, Massachusetts (*Id.* at ¶ 9) (emphasis added);

- "Harbour BioMed is a holding company which does not directly hire any employee or directly hold intellectual property. Rather, Harbour BioMed hires employees to operate businesses that hold Harbour's assets through its various subsidiaries located mainly in the United States and China. All financial results of its subsidiaries are consolidated into Harbour BioMed's financial results. Therefore, any benefits to or damages sustained by Harbour BioMed's subsidiaries inure to

---

must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

[3]    Factual disputes are not properly considered in Rule12(b)(6) motion because all well-plead facts must be accepted as true.  *See, e.g., Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314-15 (D. Mass. 2022) ("In its motion to dismiss, Gannett contradicts the alleged facts, contending that Facebook, not defendant, placed the tracking pixel on the USA Today website. Such a factual dispute cannot be resolved on a motion to dismiss at which stage the Court must treat all non-conclusory factual allegations in the complaint as true.").

Harbour BioMed. For this reason and the sake of simplicity, 'Harbour' also refers to Harbour BioMed's other subsidiaries and their respective operating business and assets as a whole, where appropriate" (*Id.* at page 4, fn 1);

- "Xu has held various positions within Harbour, including CSO (Chief Strategy Officer), CBO (Chief Business Officer) and CFO (Chief Finance Officer) of Harbour, and **President of Harbour's business unit in the United States**." (*Id.* at ¶ 16) (emphasis added);

- "Xu reported to the CEO of Harbour. Xu was also a member of Harbour's Executive Committee and had full access to Harbour's business plans and strategies. Xu's responsibilities included serving as the Global Head of Business Development, **with his duties being focused primarily in the United States**. (*Id.* at ¶ 17) (emphasis added).

Numerous other allegations, which must be taken as true, demonstrate that Harbour has plausibly alleged facts that Xu owed duties, including fiduciary duties, to Harbour BioMed and to other Harbour entities in addition to Harbour Antibodies. In light of the standards applicable to a motion to dismiss and the notice pleading requirements, that is enough, and Harbour need not plead additional facts, quote from additional documents, or attach those documents to this Opposition to survive the Motion to Dismiss. Harbour reserves all rights to present those additional facts and documents for the Court's review at the appropriate time in this case.

**C. Harbour Antibodies has "Standing" to Bring This Action.**

Xu next argues that Harbour Antibodies "does not have standing to maintain any of the causes of action because it did not own the Compound and incurred no damages." Dkt. 18 at p. 6.

First, Xu's allegation directly contradicts his prior (false) contention that he was only employed by and owed fiduciary duties to Harbour Antibodies. *See* Dkt. 18 at p. 1. Xu admits that he signed the Employment Offer Letter and the NDA with Harbour Antibodies. *See id.*; *see also* Dkt. 18-2, Xu's Ex. 1. Accordingly, any breach of those agreements by Xu necessarily causes damage to Harbour Antibodies, including but not limited to "the benefits of Xu's promised exclusive work for Harbour, in the amount of at least his annual salary …." *See* Dkt. 1 at ¶ 77.

6

Second, Xu asserts, without offering any foundation (or even furnishing any authenticating document) that the Assets at issue are owned by "Nona Biosciences Suzhou" (Dkt. 18, p. 1). But again, it is the Complaint allegations, not Xu's statements to the contrary, that must be accepted as true on a 12(b)(6) motion. *See Llorens*, 2024 U.S. Dist. LEXIS 218211, at *5.

In the Complaint, Harbour alleged that various wholly-owned subsidiaries of Harbor BioMed hold all of its Assets, and that all of the Assets ultimately inure to the benefit of Harbour BioMed. *See* Dkt. 1 at p. 4, fn 1. The Complaint alleged that "Harbour" owns the Assets (*id.* at ¶ 26), which by definition in the Complaint includes Harbour BioMed, Harbour Antibodies, and other wholly-owned subsidiaries (*see id.* at p. 1, p. 4 fn 1). Thus, at best, Xu has identified a factual dispute regarding ownership of the Assets, which cannot be resolved on a 12(b)(6) motion. *See, e.g., Belozerov*, 646 F. Supp. 3d at 314-15.

Additionally, while Xu's exhibits cannot be considered in adjudicating the Motion, even if the Court was to inclined to do so, it would hurt rather than help Xu's position. For example, the Term Sheet Xu submits shows that it was signed by Dr. Jingsong Wang on behalf of "Nona BioMed US Inc." *See* Dkt. 18-3, Ex. 2 at p. 13; *see also* Dkt. 18-6, Ex. 5 (wherein Nona Biosciences US, Inc. is a party to the agreement) Additionally, Xu's Exhibit 3 confirms that the Assets at issue were "Harbour and Nona's innovation and technology." *See* Dkt. 18-4, Ex. 3 at p. 1; *see also* Dkt. 18-5, Ex. 4 (wherein Xu expressly recognized the "Harbour/Nona team" relating to the Kali deal involving the Assets).

Xu's Exhibit 6 also expressly recognized that Xu and Kali were negotiating with Harbour (not Nona) regarding the licensing agreement for the Assets. *See* Dkt. 18-6, Ex. 6 ("If Harbour wishes to nevertheless move forward with a termination of negotiations before the minimum time period, we would ask that Harbour promptly reimburse Kali's legal fees…."). And Xu's Exhibit 7 shows that the investor addressed the letter to "Harbour BioMed US." *See* Dkt. 18-8 at p. 1.

7

In short, even a cursory review of Xu's own exhibits (which are not properly before the Court) contravenes the very arguments he makes regarding ownership of the Assets. Again, at best, there may be a factual issue regarding the existence of inter-company implied or express agreements, the legal import of which can only be resolved following discovery. Xu is unable to show, in the context of the Motion, that Harbour Antibodies lacks standing to bring its claims.

### D. **Harbour Has Pled a Valid Cause of Action for Breach of Xu's Fiduciary Duties.**

In addition to arguing that the Complaint should be dismissed because Plaintiffs do not own the Assets and Xu owed no duties to Harbour BioMed because he was not employed by that entity (both of which Harbour refuted above), Xu next attempts to defeat Harbour's claims by arguing that Harbour was aware of, and approved, all of Xu's activities. *See* Dkt. 18 at p. 8.

As he must, Xu acknowledged that a corporate officer owes fiduciary duties and "cannot choose to advance his own personal interests over those of his employer." *Id.* But according to Xu, Harbour's breach of fiduciary duty claim should be dismissed because the Complaint does not allege facts that show Xu's self-dealing. *See id.* at 2.

Xu is wrong. The Complaint contains a detailed narrative of Xu's self-dealing. *See* Dkt. 1 at ¶¶ 29-42. Those allegations are underscored by Xu's own admission, as quoted in Paragraph 43:

> On March 13, 2024, Xu wrote to one investor: "I think our term[s] will be very similar to this [Second Opportunity Term Sheet] **except I do not want to give revenue share with Harbour in case of a sublicense. This is not in Cytokali's interest**." (Emphasis added.) In short, he understood the conflict between Harbour's interests and Kali's interests and deliberately chose to advance the interests of Kali, to the detriment of Harbour.

Dkt. 1 at ¶ 43. The Complaint also details how the Second Opportunity, which Xu rejected, was much better for Harbour, but less favorable to Xu. *See id.* at ¶ 59. Harbour also alleged that, unbeknownst to Harbour, the Third Opportunity provided Xu with a substantial equity interest, which he eventually increased at the expense of Harbour's upfront payment. *See id.* at ¶¶ 60, 64.

In support of his argument, Xu also falsely claims that the Complaint is devoid of allegations that any emails were taken from Harbour.  *See* Dkt. 18 at p. 2, fn 1.  However, at Paragraph 48 of the Complaint, Harbour specifically alleged that Xu sent emails labeled CONFIDENTIAL to his personal Gmail account.  Harbour also alleged: "There was no legitimate business reason for Xu to use anything other than his Harbour email account, or for him to send Harbour emails, including Harbour's confidential and Proprietary Information, to any other account."  Dkt. 1 at ¶ 48.  Sending company emails containing proprietary information to a personal account constitutes misappropriation of those emails.  *See, e.g.*, *API Ams., Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148-49 (D. Kan. 2019) (finding misappropriation when defendant transmitted emails from his business account to his personal account without permission and defendant did not return the emails when he left plaintiff's employment).  It also violates Section 1.1 of the NDA, which required Xu to hold all of Harbour's Proprietary Information in the strictest confidence and not to use it except in connection with his work for the Company.  *See* Dkt. 1 at ¶ 20  ("all Proprietary Information shall be the sole property of the Company and its assigns").

As for Xu's contention that Harbour knew about and approved of all of his activities, it is evident that Xu has misconstrued the essence of the Complaint, which lies in the nuance between what Xu was asked to do by Harbour *for Harbour's benefit* and what Xu actually did, which covertly placed his own interests above the interests of Harbour.

For example, the Complaint alleged that Xu was tasked with finding investors to license Harbour's Assets using a newco model (Dkt. 1 at ¶ 25), and that the newco model was preferred because it would ensure that the biotech licensor (Harbour, not Xu) would hold a substantial equity interest in the new entity (*id.* at ¶ 24).  While Xu may have been empowered to form the new entity, negotiate a license, and even become an executive in the new entity (Dkt. 18 at p. 8-9, Dkt.

1 at ¶ 27-28), Xu was expected to negotiate a significant upfront payment and an equity interest for Harbour (Dkt. 1 at ¶ 28), not a substantial equity interest for himself at Harbour's expense.

Xu was also required to present all proposed term sheets to Harbour's CEO and Legal Department for review prior to acceptance or rejection. *Id.* at ¶ 27. Xu failed to forward the First Opportunity or the Second Opportunity to Harbour, or to otherwise make Harbour aware of those opportunities. *See id.* at ¶¶ 30, 32. The Complaint also alleged that Xu rejected those potential investors, which would have provided substantial payments and equity to Harbour, because the terms of those deals would not have allowed Xu to capture desired benefits for himself. *See* Dkt. 1 at ¶¶ 32 - 39. And regarding the Third Opportunity, Xu initially negotiated his own interests, lied to the investors about approval by Harbour's Board, and then convinced Harbour to approve the deal by misrepresenting both Xu's own position and the position of the investors. *Id.* at ¶¶ 40-44, 50 -53, 59, 63-65, 74. No one on Harbour's management team, including Dr. Wang, possessed all of the information about Xu's activities and negotiations.[4] Those covert activities that placed Xu's interests above Harbour's interests form the basis of Harbour's claims.

In light of the foregoing, and the additional allegations contained in the Complaint (Dkt. 1 at ¶¶ 79-85), Harbour has alleged facts establishing all elements of the cause of action; *i.e.*, (1) the existence of a fiduciary duty, based upon the relationship of the parties; (2) a breach of that duty; (3) damages; and (4) a causal connection between the breach and the damage suffered. *See e.g., Trowt v. Silva*, Nos. 129018, ESCV201101279, 2014 Mass. Super. LEXIS 195, at *18 (Oct. 31, 2014) (citing *Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164, 705 N.E.2d 279 (1989)).

---

[4] Xu cites to *Puritan Med. Ctr. v. Cashman* in support of its argument regarding Harbour's knowledge and approval of Xu's actions, but that case expressly states that "there may be no ratification of self-dealing without full disclosure." *See* 596 N.E.2d 1004, 1008 (1992). The Complaint makes clear that Xu did not disclose, and actively concealed, his conduct.

The duty and breach elements are discussed in detail above and will not be repeated for the sake of brevity. Harbour has alleged damages at Paragraphs 77 - 78 of the Complaint, and the requisite causal connection at Paragraphs 75-76 and 85 of the Complaint. Specifically, Harbour has alleged that "[b]ased on its conclusion that **Xu's misconduct and extensive self-dealing permeated the entire negotiations** surrounding the 4/21 Term Sheet, …, Harbour was required to notify the investors that Harbour was unable to proceed with the transaction." Dkt. 1 at ¶ 75 (emphasis added). Harbour's resultant damages include but are not limited to opportunities to benefit from exclusively licensing and/or investing in Harbour's Assets **on terms and at prices that were not tainted by Xu's self-interest**, and expenses (including legal fees) incurred by Harbour related to the 4/21 Term Sheet, negotiations, and potential deal closing. Dkt. 1 at ¶ 77 (emphasis added). All of those well-plead allegations must be taken as true for the purpose of the Motion, and Xu's Motion, therefore, must be denied.

### E. Harbour Has Pled a Valid Breach of Contract Claim Against Xu.

To demonstrate a claim for breach of contract, plaintiffs must allege: (1) an agreement between the parties, supported by valid consideration; (2) the plaintiffs were ready, willing, and able to perform; (3) the defendant committed a breach of the contract; and (4) the plaintiffs sustained damages. *See, e.g., Singarella* v. *Boston*, 342 Mass. 385, 387, 173 N.E.2d 290 (1961).

Harbour has alleged, *inter alia*, the following facts in support of its contract claim:

- As a condition of his employment, Xu signed the Employment Offer Letter and the NDA, both of which are valid written contracts (Dkt. 1 at ¶¶ 15, 88; Dkt. 18-2);

- Harbour was ready, willing and able to perform, and in fact, did perform all of their duties under the contract, except to the extent those duties were excused or waived (Dkt. 1 at ¶ 90);

- The Employment Offer Letter required Xu "to devote [his] full time and effort to the business and affairs of the Company" (*id.* at ¶ 15), and Xu breached that contract by not devoting his full time and attention to the business and affairs of the

Company, but instead advanced his own interests over Harbour's interests (*See, e.g., id.* at ¶¶ 43, 59, 60, 64, 86, 92);

- In the NDA, Xu agreed that "[a]t all times during my employment with the Company and thereafter, I will hold in strictest confidence and will not disclose, **use,** or publish any of the Proprietary Information (defined below), **except** as such disclosure, use or publication may be required **in connection with my work for the Company**, or unless an officer of the Company expressly authorizes such in writing. … I hereby … **recognize that all Proprietary Information shall be the sole property of the Company and its assigns** (*Id.* at ¶ 20) (emphasis added);

- Xu breached the NDA by, among other things, sending Confidential and Proprietary information to his personal Gmail account (*id.* at ¶¶ 48, 86, 92), and by using Harbour's Confidential and Proprietary information for his own benefit and to the detriment of Harbour's own interests (*see, e.g., id.* at ¶¶ 43, 59-60, 64, 86);

- In the NDA, Xu also agreed that he "will not, without the Company's express written consent, engage in any employment or business activity other than for the Company… ." (*Id.* at ¶ 22).  Xu breached this provision of the NDA by (i) using Harbour's Confidential and Proprietary information for his own benefit and to the detriment of Harbour's interests (*see, e.g., id.* at ¶¶ 43, 59, 60, 64, 86, 92); (ii) directly or indirectly, competing with the business or anticipated business of Harbour (*see id.* at ¶ 91) and taking steps or actions to facilitate or prepare for competition with Harbour (*see id.*); and (iii) assisting other people and/or entities to compete with the business or anticipated business of Harbour and/or taking steps or actions to prepare for competition with Harbour (*see id.*);

- Harbour sustained damages as a result of Xu's breach of contract, which included the loss of opportunities to benefit from exclusively licensing Harbour's Assets on terms and at prices that were not tainted by Xu's self-interest, loss of the benefits of Xu's promised exclusive work for Harbour in the amount of at least his annual salary, and expenses (including legal fees) incurred by Harbour related to the 4/21 Term Sheet, negotiations, and potential deal closing (*id.* at ¶¶ 77-78, 93).

In arguing that the contract claim fails because Harbour was aware of his conduct, Xu again fails to distinguish between the actions that Xu was permitted to take *for Harbour's benefit* and what Xu actually did, which breached both the express terms of the contracts and the implied covenant of good faith and fair dealing.  *See id.* at ¶ 92; *477 Harrison Ave., LLC v. JACE Bos., LLC*, 134 N.E.3d 91, 101 (2019) ("A claim for breach of the implied covenant of good faith and fair dealing requires a showing that one party violated the reasonable expectations of the other party concerning the obligations of the contract.").  And as with Xu's argument that Harbour

waived its breach of fiduciary duty claim, Harbour has not waived its breach of contract claim because the Complaint clearly alleged that Harbour did not have full knowledge of Xu's activities, nor any intention to relinquish any of its contractual rights.[5]

Given the foregoing, Harbour has stated a valid claim for breach of contract against Xu, and the Motion must be denied.

### F. Harbour Has Pled a Valid Cause of Action Against Xu for Interference with Advantageous Economic Relationships.

Harbour's third cause of action requires facts that plausibly establish the following:

"(1) [Plaintiffs] had an advantageous relationship with a third party (e.g., a **present or prospective** contract or employment relationship);

(2) the defendant knowingly induced a breaking of the relationship;

(3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means;  and

(4) the plaintiff was harmed by the defendant's actions."

*Blackstone* v. *Cashman*, 448 Mass. 255, 260, 860 N.E.2d 7 (2007) (emphasis added).

Harbour alleged that it had a prospective contractual relationship with the First Opportunity and the Second Opportunity, that those relationships would have been advantageous to Harbour, and that Xu knowingly induced a breaking of those relationships.  *See* Dkt. 1 at ¶¶ 29-36, 94-96. Specifically, Harbour alleged:

- Xu knew that it would be difficult, if not impossible, to reach his preferred, self-interested deal with First Opportunity without Harbour's knowledge and approval because First Opportunity had a prior relationship with the CEO at Harbour; and

- Xu also knew that his self-dealing would likely not work with Second Opportunity because it was to be the licensee (not a separate newco Xu planned to set up by himself), and Second Opportunity already had a management team in place. Xu knew it would be difficult for him to be named as the CEO of Second Opportunity or own an equity interest in that entity as a founder. Thus, he effectively terminated

---

[5] *Cueroni v. Coburnville Garage, Inc.*, 315 Mass. 135, 138, 52 N.E.2d 16, 18 (1943) provides no aid to Xu, because it expressly states that "[w]aiver is a question of fact."

the Second Opportunity negotiations for much the same reasons as he terminated the negotiations with First Opportunity—his own financial interests.

*See id.* at ¶¶ 35-36. Harbour also detailed how the Second Opportunity, in particular, would have been much more advantageous to Harbour than the Third Opportunity that Xu preferred. *See id.* at ¶ 59. And Harbour explained how "Xu focused all of his energies on ensuring that the transaction was done through his Kali/CytoKali entity rather than negotiating the best financial terms for Harbour, because this would provide (i) Xu with an ownership interest in the newco entity as its founder; and (ii) lower payments to Harbour so that his Kali/CytoKali entity could preserve cash …." *Id.* at ¶ 39.[6]

Harbour also had a prospective and/or actual contractual relationship with the Third Opportunity, which would have been advantageous to Harbour. *See id.* at ¶ 75 ("the agreements were finalized and the investors in Kali were ready to close the deal"). Harbour alleged that Xu knowingly induced a breaking of the Third Opportunity relationship by, among other things, creating "a false sense of urgency, seeking to force Harbour to quickly accept what he had proposed and allegedly negotiated" (*Id.* at ¶ 66; *see also* ¶ 50); verbally attacking Harbour's employees (*Id.* at ¶ 67); making unusual demands about the press release (*Id.* at ¶ 68); and promising Harbour a seat on the board of Kali and then indicating that the investors would not allow that to occur (*Id.* at ¶ 63). *See also id.* at ¶ 75 ("Based on its conclusion that Xu's misconduct and extensive self-dealing permeated the entire negotiations … Harbour was required to notify the investors that Harbour was unable to proceed with the transaction.").

---

6    Xu alleges that the Term Sheets were not business relationships and that the Term Sheets were just offers to negotiate (Dkt. 18 at p. 13), but Harbour has alleged interference with *prospective* business relationships. Moreover, courts have indicated that a term sheet can constitute a prospective contractual or advantageous relationship. *See, e.g.*, *Dow v. Casale*, 31 Mass. L. Rep. 92 (2013); *Antrim Pharm. LLC v. Bio-Pharm, Inc.*, 310 F. Supp. 3d 934, 937 (N.D. Ill. 2018) (finding a Term Sheet to be an agreement to form a new entity to produce pharmaceutical products even though it was to be replaced by a "Definitive Agreement").

As to the third element of this cause of action, Harbour alleged that Xu used improper means when, *inter alia*, he covertly disrupted the First Opportunity and the Second Opportunity without even disclosing those opportunities to Harbour (*Id.* at ¶¶ 29-36, 94-96), and that Xu also had an improper motive when conducting the negotiations – he had a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *See, e.g., King* v. *Driscoll*, 418 Mass. 576, 587 (1994), *S.C.*, 424 Mass. 1 (1996).  Xu not only sought to advance his own interests, but he knowingly did so at the specific expense of Harbour's interests.  As Harbour alleged:

> On March 13, 2024, Xu wrote to one investor: "I think our term[s] will be very similar to this [Second Opportunity Term Sheet] **except I do not want to give revenue share with Harbour in case of a sublicense. This is not in Cytokali's interest**." (Emphasis added.)  In short, he understood the conflict between Harbour's interests and Kali's interests and deliberately chose to advance the interests of Kali, to the detriment of Harbour.

Dkt. 1 at ¶ 43; *see also* ¶¶ 35-36 (quoted above).  Xu also purposefully misled Harbour into believing that the 4/21 Term Sheet represented the best deal that could be obtained for the Assets, even though Xu had terminated a more lucrative potential deal with Second Opportunity.  *See id.* at ¶ 63.  Further, Xu agreed with investors on the financial terms without consulting Harbour, and reduced the upfront payment to Harbour, while increasing his own equity interest.  *See id.*

Xu expressly recognized his conflict of interest with Harbour, stating to the investors: "To act on behalf of Kali, I might need to resign from Harbour first to make it conflict free." *See id.* at ¶ 40.  But Xu did not resign from Harbour, nor did he disclose the conflict to Harbour.  *See id.* Instead, he repeatedly expressed his false loyalty when Harbor began to question his motives:

- On March 25, 2024, Xu wrote to the CEO of Harbour and others: "Despite perceived 'conflict of interest' from Harbour's internal view, I as CBO of Harbour am still doing my best to negotiate a best deal on behalf of Harbour against investors. So anything I am presenting here is in the interest of Harbour's benefits deeply in mind as well" (*Id.* at ¶ 52); and

- On April 23, 2024, Xu wrote to the broader Harbour deal team: "Whatever the project team needs to accomplish is still for the interest of Harbour/Nona to

maximize the value of this program…Deal terms can be negotiated but project progress is not negotiable. This email shall serve the purpose ONCE FOR ALL and ON THE RECORD that everyone on this email chain is still one team. We are still together to get things done" (emphasis provided by Xu)  (*Id.* at ¶ 61).

With respect to damages, Harbour alleged that it "suffered damages as a direct and proximate cause of Xu's interference with Harbour's prospective business relationships," (*Id.* at ¶ 103), including but not limited to opportunities to benefit from exclusively licensing and/or investing in Harbour's Assets on terms and at prices that were not tainted by Xu's self-interest (*Id.* at ¶ 77).  Additionally, Paragraph 59 of the Complaint expressly details that the upfront payment for the Second Opportunity was millions of dollars higher for one asset than the upfront payment in the 4/21 Term Sheet for multiple Assets and that the ongoing clinical/regulatory and milestone payments were several hundreds of millions of dollars higher with the Second Opportunity.

Given the foregoing, Harbour satisfied FRCP 8 and stated a plausible claim for interference with advantageous economic relationships against Xu, and the Motion should be denied.

### G. **Harbour Has Pled a Valid Claim Against Xu for Fraud.**

To state a valid claim for fraud, a plaintiff must allege that the defendant made a false representation of a matter of material fact, with knowledge of its falsity, for the purpose of inducing action thereon, and that the plaintiff relied upon the representation as true and acted upon it to its damage.  *See Balles v. Babcock Power Inc.*, 476 Mass. 565, 573-74, 70 N.E.3d 905, 913 (2017).

Xu knowingly made numerous false statements of alleged fact (not opinion) to Harbour regarding material issues, for the purpose of inducing Harbor to agree to the 4/21 Term Sheet:

- Xu purposefully mislead Harbour that the 4/21 Term Sheet represented the best terms that could be obtained for the Assets, **even though he had terminated a more lucrative potential deal with the Second Opportunity** (*see* Dkt. 1 at ¶ 63; *see also* ¶ 59, detailing the better terms of the Second Opportunity);

- Xu originally assured Harbour that it would have a seat on the board of Kali**, but he had already agreed** with the co-lead investors that Kali would have only three board directors, appointed by the two co-lead investors and Xu (*see id.*)*;* and

- Xu informed Harbour that it needed to assign someone to negotiate the deal on behalf of Harbour while Xu represented Kali/the investors (*id.* at ¶ 50), **but Xu had already agreed with the investors on the financial terms for Harbour** (*Id.* at ¶ 64); in fact, Xu had already signed the Term Sheet in relation to the Assets, which effectively limited any purported negotiations with Harbour (*Id.* at ¶ 53).

Harbour also alleged that its reliance on Xu's false statements was reasonable and justifiable. *See, e.g., Collins v. Huculak*, 57 Mass. App. Ct. 387, 391-92, 783 N.E.2d 834, 838-40 (2003). Xu served as an executive officer of several Harbour entities. *See* Dkt. 1 at ¶ 16. Xu owed fiduciary and contractual duties of loyalty to Harbour. *See id.* at ¶¶ 15, 22. And as quoted above, Xu reaffirmed his loyalty to Harbour on several occasions at critical milestones in the negotiation process. *See id.* at ¶¶ 52, 61. As such, it was both reasonable and justifiable for Harbour to rely on Xu's statements in agreeing to the 4/21 Term Sheet, *see id.* at ¶¶ 57, 61, 75, and Harbour was damaged due to its reliance on the false statements, *see id.* at ¶¶ 76-78.

Accordingly, Harbour has satisfied the requirements of Rule 9 and stated a valid claim for fraud against Xu, and the Motion should be denied.

## H.  Harbour Has Sufficiently Pled Xu's Violation of the Defend Trade Secrets Act

To state a claim under the DTSA, a plaintiff must establish: (1) the information constitutes a trade secret, (2) it took reasonable measures to secure confidentiality, (3) the trade secret was obtained through improper means; and (4) the trade secret is used or intended to be used in foreign commerce. *See G&L Plumbing, Inc. v. Kibbe*, 699 F. Supp. 3d 96, 105 (D. Mass. 2023). Under the DTSA, misappropriation is "disclosure or use of the trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." *T.H. Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *38 (D. Mass. Mar. 17, 2020).

Harbour alleged that its trade secrets include documents and data relating to its research and development ("R&D") and to its business plans for licensing or otherwise monetizing the R&D ("Business Plans and Prospects") and that the trade secrets are used in interstate and foreign commerce. *See* Dkt. 1 at ¶ 120. (The fact that the Cayman Island company has wholly-owned subsidiaries in the U.S. to monetize its Assets also shows use of the trade secrets in interstate commerce. *See id.* at p. 4, fn 1.) The R&D trade secrets include technical data, testing, and protocols related to advances that Harbour has made in therapies for treating cancer patients and other applications. *See id.* at ¶ 120. The Business Plans and Prospects trade secrets include contact information for key decisionmakers at various companies, information on their levels of interest, and prospects for entering into licensing or other agreements for the R&D. *See id.*

The Complaint alleged that both types of trade secrets are integral to Harbour's business and have great economic and commercial value to Harbour from not being generally known or readily ascertainable through proper means to others in the industry that could benefit from them. *See id.* at ¶ 121. Harbour further alleged that Xu knew that Harbour's trade secrets should be maintained in a confidential manner, and Xu expressly agreed to do so in the contracts he signed with Harbour. *Id.* And Harbour alleged that it has taken other similar proper and reasonable measures to keep its R&D and Business Plans and Prospects secret. *See id.* at ¶ 120.[7]

The Complaint also alleged that Xu had full access to Harbour's business plans and strategies, in addition to other Confidential and Proprietary data, *see id.* at ¶ 17, and that Xu misappropriated Harbour's trade secrets by wrongfully forwarding emails and attachments marked CONFIDENTIAL to his personal email without Harbour's permission. *See id.* at ¶ 122. There was

---

[7]  Harbour has also taken appropriate steps in this lawsuit to maintain the confidentiality of its trade secrets by impounding the unredacted version of its Complaint and by insisting that Xu retract and seal the confidential portions of his Motion to Dismiss and Exhibits.

no legitimate business reason for Xu to forward emails containing Harbour's trade secrets to his personal Gmail account. *Id.* at ¶ 48. In fact, the NDA signed by Xu expressly recognizes that "all Proprietary Information shall be the sole property of the Company and its assigns." *Id.* at ¶ 20; *See also, e.g., API Ams., Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148-49 (D. Kan. 2019) (finding a violation of the DTSA when defendant transmitted emails containing plaintiff's trade secrets from his business email account to his personal account without permission and defendant did not return the emails and associated documents when he left plaintiff's employment). In *Aon PLC v. Infinite Equity, Inc.*, No. 19 C 7504, 2021 U.S. Dist. LEXIS 175378, at *44-45 (N.D. Ill. Sep. 15, 2021) (emphasis added), the court catalogued similar instances that constituted misappropriation or a likelihood of success on a misappropriation claim:

> *Moss Holding Co.*, 2020 U.S. Dist. LEXIS 39068, 2020 WL 1081730, at *7 (evidence of misappropriation where defendants used "their personal Gmail accounts, while still employed at [plaintiff], to send emails **containing non public client and project information**."); ... *Signal Financial Holdings LLC*, 2018 U.S. Dist. LEXIS 15106, 2018 WL 636769, at *4 (employer likely to succeed on its misappropriation claim where former employee improperly **emailed herself confidential slide deck**); *Allied Waste Services of North America, LLC v. Tibble*, 177 F.Supp.3d 1103, 1112 (N.D. Ill. 2016) (denying motion to dismiss claim for misappropriation because the former employee **emailed plaintiff's confidential information to his personal email** account shortly before his employment ended).

Additionally, after Xu was terminated, he attempted to delete portions of his Harbour email account. Dkt. 1 at ¶ 7. Harbour submits that there was no legitimate business reason for Xu to delete those emails; rather, Xu was attempting to cover up his improper conduct. *See e.g., KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, Civil Action No. 21-10572-MRG, 2024 U.S. Dist. LEXIS 65395, at *41 (D. Mass. Apr. 10, 2024) (finding "treacherous opportunism" and evidence of malicious trade secret misappropriation when the defendant forwarded customer information to her personal email account on her last day of employment).

The Complaint also alleged that Harbour suffered damages due to Xu's misappropriation of its trade secrets (the specifics of which will not be repeated again for the sake of brevity). *See id.* at ¶¶ 77, 122.

Because Harbour has alleged facts that reasonably infer Xu's violation of the Defend Trade Secrets Act, the Motion must be denied.

## REQUEST FOR ORAL ARGUMENT

Harbour believes that oral argument on the issues set forth herein will assist the Court in more fully understanding the nature of Harbour's business, its interrelated entities, and Harbour's causes of action. Harbour requests to be heard on all issues raised in the Motion.

## CONCLUSION

In light of the foregoing and the allegations set forth in the Complaint, Plaintiffs HBM Holdings Limited and Harbour Antibodies U.S. Inc. respectfully request that this Court deny the Motion, or in the alternative allow Plaintiffs an opportunity to replead any deficient causes of action, and provide such other or further relief as is necessary, just and proper.

Respectfully submitted this 10th day of January, 2025,

*/s/ Christopher G. Karagheuzoff*
Christopher Karaghuezoff (MA 630123)
DORSEY & WHITNEY LLP
250 Park Avenue, New York, NY 10177
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
karagheuzoff.christopher@dorsey.com

Kent J. Schmidt (CA SBN 195969)
(admitted *pro hac vice*)
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
schmidt.kent@dorsey.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document was filed through the CM/ECF system and will be electronically sent to the registered participants as identified on the Notice of Electronic Filing (NEF) on this January 10, 2025.

*/s/Christopher G. Karagheuzoff*
Christopher Karaghuezoff
