1          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2

3  HBM HOLDINGS LIMITED and HARBOUR    )
   ANTIBODIES U.S., INC.,              )
4                                      )
                  Plaintiffs           )
5                                      )  CA No. 24-12724-PBS
            -VS-                       )  Pages 1 - 29
6                                      )
   WEIHAO XU,                          )
7                                      )
                  Defendant            )
8

9          **MOTION HEARING/SCHEDULING CONFERENCE**
10                      **BY VIDEO**

11          BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
12

13

14

15

16                      United States District Court
                        1 Courthouse Way
17                      Boston, Massachusetts  02210
                        February 12, 2025, 9:31 a.m.
18

19

20

21

22                      LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
23              United States District Court
                1 Courthouse Way, Room 7200
24                  Boston, MA  02210
                    leemarz47@gmail.com
25

1    A P P E A R A N C E S:

2

3         ANGELA E. DRALLE, ESQ., Dorsey & Whitney LLP,
     801 Grand Avenue, Suite 4100, Des Moines, Iowa, 50309,
     for the Plaintiffs.

4

5         CHRISTOPHER KARAGHEUZOFF, ESQ., Dorsey & Whitney, LLP,
     51 West 52nd Street, New York, New York, 10019 for the
     Plaintiffs.

6

7         TIMOTHY K. CUTLER, ESQ, Cutler PC,
     40 Walnut Street, Suite 1, Wellesley, Massachusetts, 02481,
     for the Defendant.

8

9         CONNIE C. DAI, ESQ., Lion's Law P.C.,
     154 Wells Avenue, Suite 1d, Newton, Massachuseytts, 02459,
     for the Defendant.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G</u>

1

2          THE CLERK:  Good morning, Judge.

3          THE COURT:  Good morning to everyone.

4          THE CLERK:  So I have both sides on, so I'm going

5   to call the case.

6          THE COURT:  Okay.

7          THE CLERK:  The Court calls Civil Action 24-12724,

8   HBM Holdings Limited, et al v. Xu.  Could counsel please

9   identify themselves.

10         MR. CUTLER:  Good morning, your Honor.  Timothy

11  Cutler on behalf of the defendant, Weihao Xu.

12         MS. DAI:  Good morning, your Honor.  Connie Dai

13  for defendant Weihao Xu.

14         MR. KARAGHEUZOFF:  Good morning, your Honor.

15  Christopher Karagheuzoff for the plaintiffs.

16         MS. DRALLE:  Good morning, your Honor.  Angela

17  Dralle for plaintiffs.

18         THE COURT:  Thank you.  So before me is a motion

19  to dismiss, and I think it's sort of a complicated case, so

20  I thought maybe plaintiff would tell me a little bit about

21  the case before we got into the arguments.

22         MR. KARAGHEUZOFF:  Sure.  The complaint in the

23  case involves the plaintiff, HBM Holdings Limited, which we

24  refer to --

25         THE COURT:  Believe it or not, I'm having a little

1    trouble hearing you.  You're a little muffled.

2              MR. KARAGHEUZOFF:  Yes, let me -- is that better?

3              THE COURT:  Yes.  Can everyone hear?  Mem, Lee?

4              MR. KARAGHEUZOFF:  So the plaintiff is HBM Holdings

5    Limited, which is called Harbour BioMed and Harbour Antibodies

6    U.S., which we call Harbour Antibodies in the papers.

7    Collectively we refer to them as "Harbour."  And just to be

8    clear, Harbour BioMed is also defined in the complaint to

9    include its various subsidiaries and affiliates.  Harbour

10   BioMed is a holding company, so it doesn't do (Inaudible), at

11   least officially.  But all of the financials, for example, for

12   Harbour BioMed consist of the reporting of the subsidiaries

13   directly into the holding company.

14             The defendant is named Weihao Xu, and he until

15   sometime last year worked for Harbour.  And, again, Harbour

16   BioMed and Harbour Antibodies we collectively refer to as

17   "Harbour" in the complaint.  He worked for Harbour up until

18   last year.  He, as the complaint details with actually a lot of

19   detail and specificity, he was charged with negotiating a

20   transaction for the company whereby certain of its assets would

21   be put into another company, and it would license those assets

22   in part and share in the revenue with a larger -- usually it's

23   a larger pharmaceutical company that would be in a better

24   position to exploit those assets.

25             And what the complaint details, again, with a pretty

1    high degree of specificity, are various corporate opportunities

2    that defendant was charged with negotiating, but that he did

3    not report back to the company because simultaneously he was

4    pursuing his own interest in the assets by setting up his own

5    company and trying to negotiate a deal that would personally

6    financially benefit him to the detriment of Harbour.

7         That was not disclosed.  The conduct was not disclosed.

8    When it was finally disclosed, or I should say when the company

9    finally learned of it, this was well after two corporate

10    opportunities had come and gone that he did not report back to

11    the company about, in favor of a third corporate opportunity

12    which had reached the term sheet stage before our client had

13    any involvement in negotiating that term sheet, and which was

14    not nearly as beneficial as some of the other corporate

15    opportunities that he presented.  The company had to pull out

16    of that term sheet to separate embarrassment because it was not

17    aware of both plaintiff's self-interest and of these other

18    opportunities that had been presented to the defendant but not

19    to the plaintiff --

20         THE COURT:  That's what was confusing to me.  So those

21    first two corporate opportunities, did he take them?

22         MR. KARAGHEUZOFF:  No, and he didn't present them to

23    Harbour either.

24         THE COURT:  So why would he thwart that if he didn't

25    take them?

1          MR. KARAGHEUZOFF:  Because the structure of those

2    transactions was less advantageous to him personally.  So he

3    was, and as the complaint sort of makes clear in some detail

4    when it discusses the parameters of the first opportunity and

5    the second corporate opportunity and the third corporate

6    opportunity, the difference was, to him, the third corporate

7    opportunity was more lucrative to him and the side company that

8    he was using to try to exploit his own personal interest and

9    elevate that above that of Harbour.  So while the parameters of

10   the other corporate opportunities were more advantageous to

11   Harbour, they were not more advantageous to the defendant

12   personally.  And so he was less interested in pursuing those

13   and didn't present the offers in connection with those

14   opportunities to Harbour because they were not in his personal

15   interest.

16          THE COURT:  So this third opportunity, did he take for

17   Harbour and himself?

18          MR. KARAGHEUZOFF:  The third opportunity reached the

19   term sheet stage.  The company was then sort of informed of the

20   terms of the term sheet.  The company was exploring it until it

21   subsequently learned about a lot of the conduct that has been

22   alleged in the complaint.  And then it backed out of the deal.

23   It didn't consummate the deal.  It was not obligated to.  So it

24   did not consummate the deal because it was tainted by so much

25   self-interest, and so the company ultimately had to pull out of

1    it.

2            THE COURT:  So I couldn't quite figure out -- I

3    understand that you're claiming breach of fiduciary duty and

4    conflict of interest.  I couldn't figure out what the damages

5    were here.

6            MR. KARAGHEUZOFF:  I understand.  There are a number

7    of different damages that we allege.  Some of them are very

8    basic and very easy to prove.  Others will require probably

9    expert testimony in this case.  Certainly there are provisions

10   in this contract that require him to dedicate his full time and

11   attention to the company, so we're certainly entitled, we

12   believe, to the compensation that we paid him because what he

13   was doing was --

14           THE COURT:  So is this just about him paying back his

15   salary during that period of time?

16           MR. KARAGHEUZOFF:  No, it's not just about paying back

17   his salary.  The complaint is very careful to make sure to

18   allege damages that certainly satisfy, you know, the Federal

19   Court standing, and the ones that are easy to prove without

20   expert testimony are damages associated with the compensation

21   that he received, with the attorneys' fees and the corporate

22   fees the client was paying in connection with pursuing

23   transactions that it didn't understand were tainted by such

24   self-interest until later.

25           But there are other damages.  There are

1  harm-to-reputation damages.  There are damages because the

2  company has been both considerably embarrassed within the

3  investment community because it had to pull out of the

4  transaction.  There are damages associated with -- and, again,

5  this will likely require expert testimony --

6          THE COURT:  Are there any -- you allege trade secrets,

7  but I haven't heard any yet.

8          MR. KARAGHEUZOFF:  The trade secrets have to do

9  with -- as the complaint details, your Honor, there are various

10 trade secrets that we allege.  First of all, he sent to

11 himself -- let me be clear.  Corporate alleged that its trade

12 secret information included documents and data related to R&D

13 and to its business plans for licensing or otherwise monetizing

14 the R&D.  And the R&D trade secrets include technical data,

15 testing, protocols relating to the advances that Harbour has

16 made in therapies for treating cancer patients, business plans,

17 trade secrets --

18         THE COURT:  Did he disclose them to anyone else, or he

19 just took them for himself?

20         MR. KARAGHEUZOFF:  He sent them all to himself, your

21 Honor, but to his Gmail account, presumably --

22         THE COURT:  While he was still at the company?

23         MR. KARAGHEUZOFF:  -- at the company.  He also then

24 tried to destroy a bunch of documents that evidenced conduct in

25 which he engaged, not realizing that these emails would be

1    archived.  So on his way out the door, after he had been

2    terminated as a result of the conduct that the complaint

3    alleges, he also then tried to delete a bunch of the emails in

4    which he acknowledges, or at least demonstrates, a lot of the

5    conduct that the complaint alleges with respect to his dealings

6    with the first opportunity, the second opportunity, reasons why

7    he preferred the third opportunity, because it was in his own

8    company's best interest.

9           THE COURT:  So your trade secrets claim is basically

10   that he -- I'm not sure -- he didn't give it to anybody else

11   but that he kept some of these documents?

12          MR. KARAGHEUZOFF:  Well, first of all, you know, I

13   guess it's unclear at this point to what extent -- we know he

14   sent them to himself.  We know he exploited the information --

15          THE COURT:  While he's still at the company?

16          MR. KARAGHEUZOFF:  Right, but there was no reason for

17   him to send them to his personal Gmail account.  He wanted to

18   take that information with him.

19          THE COURT:  I'm just trying to figure out, isn't that

20   the basis -- what's the basis for federal jurisdiction?

21          MR. KARAGHEUZOFF:  Your Honor, there's damages well in

22   excess of $75,000.

23          THE COURT:  Diversity of citizen?

24          MR. KARAGHEUZOFF:  No.

25          THE COURT:  It's not hinging on the trade secret?

1          MR. KARAGHEUZOFF:  It's not hinging on the trade

2     secret.

3          THE COURT:  Because that was the one that was the

4     hardest to understand.  All right, thank you.

5          So from the point of view of the defendant.

6          MR. CUTLER:  Yes, your Honor, I'll speak on behalf of

7     the defendant.  Do you want me to just start talking, or do you

8     have specific questions you want to address to me?

9          THE COURT:  Well, just what's his view of the thing?

10    Is this a --

11         MR. CUTLER:  The bottom line here, it's an emotional

12    case brought by Mr. Wang.  He got upset when it became evident

13    that as a result of some tally-up, Weihao would receive

14    7.5 percent of the equity; Mr. Wang was going to receive less.

15    He brought everything to a crashing halt and --

16         THE COURT:  I don't know what you're talking about.

17    Don't forget, you have to teach me all baby steps.

18         MR. CUTLER:  I apologize.  So, well, anyhow --

19         THE COURT:  So your client worked for Harbour?

20         MR. CUTLER:  My client worked for Harbour and signed

21    the contract for Harbour, worked for Harbour to go out and

22    monetize the compound which is owned by Nona, and he did

23    exactly that.  And this compound is set up as a base for

24    developing other drugs, and mainly autoimmune drugs.  So it

25    itself is not a drug or solution.  It is a foundational piece

1    in which you could add -- and I'm sorry for the lack of

2    sophistication in my description -- but add things to it in

3    order to make it an effective drug in particular areas, and in

4    particular autoimmunity is what this is focused on.  And it's

5    not the only compound.  There are multiple compounds out there

6    offering the same thing.

7            And this drug, no one had this drug.  It wasn't

8    booming.  No one was interested in it.  And this drug, along

9    with other ones, was his job to go out and try to find buyers.

10   And he went out, and there were two -- two term sheets came in.

11   None of them were firm, and they basically were not a firm

12   price, and all they would have done was tie up the drug, and

13   you couldn't offer it to anybody else, which then would have

14   put you in a bad financial negotiating position.  You couldn't

15   get then a price for it.  They were just testing the waters.

16   And you can see that directly in the term sheet of one of the

17   first deals.  We don't have the second term sheet.

18           My client went directly to Mr. Wang, told Mr. Wang,

19   and he made a counteroffer as part of his job, and it didn't go

20   anywhere --

21           THE COURT:  This is something that Mr. Wang knew

22   about?

23           MR. CUTLER:  He absolutely knew about it.  And then

24   they said, "Okay, let's be creative.  We've got this whole

25   thing going, the newco model."

1          So the newco model is, you set up a new entity.  The

2     person with the drug or the compound donates the compound to

3     the entity.  And then you have the investors, and they put the

4     money into the entity, and then everyone shares in the equity

5     of it.  So versus the older model was, "You have a compound.

6     I'll buy your compound, and then I'll use that new entity, put

7     it in that entity, put it in one of my existing entities, do

8     whatever I want with it, but it's mine to do what I want."

9          So Harbour was very excited about going to newco, as

10    pled in the complaint, and Mr. Weihao was directed to go ahead,

11    set up the newco, which is pled.  It's not a secret.  It wasn't

12    after the fact.  That was part of his duties and

13    responsibilities.  As pled in the complaint, he set up the

14    newco.  The newco was set up, and he had to have someone

15    heading it up.  Yes, Mr. Weihao was designated to head it up

16    because the investors liked it.  And Mr. Wang was totally fine

17    with it.  And in fact Mr. Wang finagled himself a position as

18    chief financial officer, which he got extra equity in this

19    newco, so that was all good.  And so it got set up.  As the

20    founder, Mr. Weihao was going to be a hundred percent owner

21    because -- I set up corporations all the time -- you set it up,

22    someone has got to hold the stock.

23          And what was going to happen, once the deal had come

24    together, then stock would have been sent out.  At that point

25    Weihao was going to retain 7.5 percent interest.  That was the

1    point that got Mr. Wang very upset, and he said, "No.  Don't

2    like that.  We're ending the deal.  All done."  And, you know,

3    everyone's going to give their spin on it.  I don't think it's

4    a spin, but it's our honest view.

5         Mr. Wang in an emotional outburst terminated our

6    client and now is bringing this case, as you point out, without

7    any damages, without any identification of trade secrets, as

8    some form -- basically throwing a hand grenade.  I'm sorry.  I

9    know that probably doesn't make any sense.

10        THE COURT:  So even if it's correct that the defendant

11   seized a corporate opportunity or breach of fiduciary duty,

12   there's no damages?

13        MR. CUTLER:  Right.  Without damages, you don't have

14   breach of fiduciary duty or taking the corporate opportunity.

15   And what was the duty?  He was told to set up Kali.

16        THE COURT:  Well, don't forget, some of the problems

17   with your motion to dismiss is that you kept it -- excuse me, I

18   have a terrible cold -- is you kept injecting documents and

19   emails, et cetera, that I can't consider on a motion to

20   dismiss.  I mean, there are only a couple of those that I could

21   consider, you know, like the agreement itself.

22        So I'm just trying to figure out, if there are no

23   serious damages and no clear trade secrets, is there a business

24   solution to this case?  I'm trying to figure this out.

25        MR. CUTLER:  We've been down that road, and what I was

1    told is, before any kind of business solution could come about,

2    my client would have to admit to all wrongdoing, make a formal

3    apology, and then there would be discussions on a potential

4    solution, and it's very difficult.

5         THE COURT:  Well, I just am not hearing a clearcut

6    damage figure.  And trade secrets are always hard when you're

7    dealing with, I don't know, internal business documents with

8    two employees.  This employee had the right to see those

9    documents.

10        MR. KARAGHEUZOFF:  If I may, let me just address some

11   of what Mr. Cutler said and just step back for a moment also.

12   First of all, there are claims in this case.  The DTSA claim --

13        THE COURT:  I'm really having trouble hearing you.

14        MR. KARAGHEUZOFF:  Sorry.  Is that better?

15        MR. CUTLER:  Yes.

16        MR. KARAGHEUZOFF:  Okay.  So, first of all, let me

17   just step back.  There are claims in this case for breach of

18   contract, for tortious interference, for fraud.  So, you know,

19   whether or not the DTSA claim -- the DTSA claim is not the

20   basis for Federal Court jurisdiction here.  I think that we're

21   certainly entitled to further discovery on a DTSA claim in

22   circumstances where an employee sent himself, for no particular

23   reason, information to his personal account that he had no

24   business sending to his personal account.  He signed an NDA.

25   He knows what he's supposed to do and what he's not supposed to

1    do.  But can I just step back for a moment.  What Mr. Cutler

2    has done is tell a story as defendant --

3            THE COURT:  Can I stop you for a minute.  That may all

4    be true.  That may all be true.  I'm just not hearing damages.

5            MR. KARAGHEUZOFF:  Your Honor, the complaint alleges

6    damages.  It certainly alleges damages in the following ways:

7    One, it talks about the damages associated -- and I can just

8    direct the Court's attention to the damages in the damages

9    portion of the complaint which talks about in the context of

10   each cause of action, but also, again, the damages that the

11   defendant caused, and those are enumerated in the complaint.

12   But more importantly, your Honor, with respect to the damages,

13   which, again, we allege include, you know, compensation,

14   attorneys' fees that we had to pay or to spend on transactions

15   that we knew nothing about that were tainted by self-interest.

16   But there are also -- we are now not able to enter into

17   transactions that were highly lucrative to the company because

18   he passed on them in favor of one that was more lucrative to

19   himself.  And so I certainly think we are entitled to discovery

20   and expert discovery with respect to those lost corporate

21   opportunities and the damages caused by his tortious

22   interference with prospective economic advantage.

23           I also want to point out, your Honor, that while --

24           THE COURT:  Well, can I just cut this off for a

25   minute.  So, in other words, you're not interested in trying to

1  settle it?

2       MR. KARAGHEUZOFF:  We conveyed a settlement offer.

3  The settlement offer had two components.  Mr. Cutler

4  conveniently left the second one out, which was the damages.

5  We made a settlement offer.  The settlement offer did include

6  an admission of the conduct alleged in the complaint.  Frankly,

7  I'm not sure why his client had a problem admitting the conduct

8  because a lot of it is in black and white in emails.

9       THE COURT:  Wait a minute.  So the answer is -- I'm

10  sorry, I need to get to the actual motion.  I get a lot of

11  these purely business disputes, and here it doesn't, frankly,

12  jump out at me what the damages are.  Sometimes I do see that

13  right away, but I don't instantly see it here, or at least it

14  will take a lot of discovery and a lot of work to get there.

15  And so I'm just trying to figure out if there is a -- he's no

16  longer working there, right?

17       MR. KARAGHEUZOFF:  He's not.

18       THE COURT:  Has he given back all the documents that

19  you claim he took?

20       MR. KARAGHEUZOFF:  I don't believe so, your Honor.  I

21  believe that we certainly know what he took and were able to

22  retrieve them by virtue of having gone back to archives and

23  emails that he deleted to try to cover his tracks, but we

24  certainly haven't received them back.

25       THE COURT:  I've just had many trade secret cases

1    where it becomes difficult to figure out, A, if it is a trade

2    secret -- it's not like the Coca-Cola formula.  It's like a

3    business record -- and, B, if it's been given back, if there

4    are any possible damages from it.  So --

5            MR. KARAGHEUZOFF:  A, nothing has been given back.

6    B --

7            THE COURT:  All right, so you don't want to settle.

8    It strikes me as just a little inter-corporate dispute that did

9    not result in huge damage numbers, is what it strikes me as.

10   It may be that this guy did something wrong and he was

11   self-dealing.  It's just I haven't yet heard what the damages

12   are from it, whether or not the first two opportunities would

13   have been that lucrative if he had gone through it.

14           But why don't we just go right now to the motion

15   because it's a complicated fact situation.  And I have to be

16   honest:  Most of it may or may not go away on summary judgment,

17   but I'm not sure how I could do this on a motion to dismiss

18   because you injected all these documents into the motion to

19   dismiss.  So maybe just rely on the ones that clearly I can

20   look at, not emails.

21           MR. CUTLER:  I'm sorry.  Is that a question or --

22           THE COURT:  Excuse me?

23           MR. CUTLER:  I'm sorry.  Were you asking us a question?

24           THE COURT:  I think we need to argue the motion.  I

25   just wanted to get a lay of the land about whether this is just

1    a business dispute that can be resolved and you're really

2    interested in doing that.

3         MR. CUTLER:  Yeah, I'll just go down through each of

4    the causes of action, and I'll give you my argument.  I'll keep

5    in mind that you, you know, you have everything in front of

6    you, you looked at everything, and we'll leave it at that.

7         So the breach of fiduciary duty, I don't think they

8    have identified what that duty is and that he breached it.  As

9    I pointed out, Weihao's job was to go ahead and to try to go

10   out and market this compound, which they admitted he's supposed

11   to do.  He did that.  The first two opportunities didn't go

12   anywhere, so they went and pursued this newco.  Again, that's

13   not in the documents; that is in the complaint.

14        Also, with regards to standing, the compound is owned

15   by Nano.  It's not owned by Harbour, it's not owned by HBM, and

16   they have just glommed them all together, and I believe you

17   can't do that.  It's almost like a reverse piercing the

18   corporate veil.  If I were to sue Harbour for something that

19   Nano had done, they would be in there telling me, "You can't do

20   that.  It could be a wholly owned subsidiary, but it is a

21   separate entity, and therefore its rights and benefits are its

22   own.  And I don't believe you could do the reverse, nor have

23   they done a derivative action saying we own all -- HBM saying,

24   "I own all the stock in Harbour, and through that ownership, I

25   am bringing --" or it's actually an (Inaudible) -- "a

1    membership interest, I'm bringing a form of derivative action."

2    So I think (Inaudible) trouble standing, breach of duty.

3           Breach of contract, the argument is he was not

4    dedicating all of his time to his business; he was dedicating

5    it to Kali.  But in the complaint they allege that Kali was the

6    newco set up as a financial tool to raise the money to try to

7    sell this compound.  So he was doing exactly what he was

8    supposed to do within his duties and responsibilities as pled

9    in the complaint.

10          The other one is that he was engaging in conflicting

11   activities.  Kali is not conflicting.  It is a tool.  It is

12   promoting --

13          THE COURT:  But I can't do that on a motion to

14   dismiss.

15          MR. CUTLER:  If --

16          THE COURT:  You may be right, but I have to look at

17   the four corners of the complaint.  They claim it was a

18   conflict.

19          MR. CUTLER:  Yes, but that's a conclusory statement.

20   That's not a fact.  I could say he walked into the room.

21   That's a conflict of interest.  You would say, "Wait a minute.

22   What about walking into the room makes it a conflict of

23   interest?  What fact?"  There has to be a fact demonstrating

24   why it's a conflict of interest.  You can't simply label it a

25   conflict of interest and end the analysis there, with all due

1    respect.

2              THE COURT:  All right, thank you.

3              MR. CUTLER:  The next one is, the same thing with the

4    conflict is, they haven't -- I'll end it here because I think I

5    made the point -- identified what the conflict is, and in fact

6    Harbour authorized the setting up of Kali, as pled in the

7    complaint, and the pursuing of doing the newco.  So if it was a

8    conflict, it was authorized.

9              Interference with advantageous relations, number one

10   is, because he's a corporate officer, you have to allege actual

11   malice, a higher standard under these circumstances, and that

12   was not alleged.  So that's purely legal.  That doesn't require

13   anything more than what's in the complaint.

14             They even get to the point of showing that Xu had

15   knowledge that he was interfering with any relations by

16   rejecting an offer in the ordinary course of his duties and

17   responsibilities.  Again, on all of these, we pointed out that

18   damages were not pled.

19             Fraud, no misleading statement, no action by Harbour

20   relying on any misleading statement.

21             And then DTSA, you point out you have to identify with

22   particularity the trade secrets up front, and all they said was

23   the R&D belonged to Nona, not even a party, and business

24   records.  I heard counsel start identifying other things.  None

25   of that is identified in the complaint, nor even would that

1    rise to a level.  They have not specified what the trade

2    secrets are.

3          Counsel said he took the -- in the complaint these

4    emails.  Well, what in those emails have the proprietary

5    information?  It's very simple to identify.  Nothing had the

6    proprietary information in it.  And then there's the confusion

7    between the deletion of emails and the forwarding of emails.

8    No emails were taken, alleged to be taken, other than there

9    were some emails sent to him through the course of his business

10   in here, and in none of those emails forwarded was there

11   anything identified in those emails constituting proprietary or

12   confidential information.

13         And, again, no facts pled he transferred it to third

14   parties, any trade secrets, or that he surreptitiously accessed

15   information for that.  And, again, they have not pled damages,

16   trade secrets.  It's either actual loss or royalty; those are

17   the two measures.  For contract, it's benefit of the bargain.

18   None of these, you know, loss of attorneys' fees -- I'm not

19   sure what legal theory that is -- is recoverable.  Sorry for

20   rushing through that.

21         THE COURT:  Thank you.  The opposition?

22         MR. KARAGHEUZOFF:  Thank you, your Honor.  Let me just

23   again step back for a moment, and then I'm happy to address

24   each claim if the Court would like.

25         THE COURT:  For some reason, your mic is just very

1    muffled.

2         MR. KARAGHEUZOFF:  Okay, let me try.  I just have to

3    get into shouting, I guess, to address whatever is wrong with

4    the mic.  My apologies.

5         Let me just step back for a moment before I address

6    each of these.  Whatever Mr. Cutler's client's views of the

7    facts are are what they are.  This is not a motion for summary

8    judgment; it's a motion to dismiss.  All of his arguments or

9    views or excuses for his conduct can be litigated in the course

10   of the case, but, as your Honor pointed out, the Court is

11   limited to the four corners of the complaint and to the few

12   additional documents that are incorporated by reference.  All

13   of the arguments that Mr. Cutler is making he's free to make

14   as discovery progresses and in summary judgment motion

15   practice, but this is not the appropriate forum and this is not

16   the appropriate vehicle in which his client gets to tell his

17   side of the story.

18        I would point to there are -- this complaint is very

19   detailed.  It is full of excerpts of emails that demonstrate

20   the self-interested way in which he was acting.  And so all of

21   the arguments that are made addressed to the notion that,

22   "Well, he was charged with the responsibility, for example, of

23   negotiating transactions," I think, either deliberately or not,

24   misconstrues the essence of the complaint because it lies in

25   the nuance between what Xu was asked to do by Harbour for

1    Harbour's benefit, and what Xu actually did, which was to

2    covertly place his own interests above the interests of

3    Harbour.

4         I don't think I can find any better example of that

5    for you, your Honor, than in Paragraph 43 of the complaint

6    where we quote the email where he says, in connection with the

7    third corporate opportunity, that he thinks our terms will be

8    similar to the second opportunity, except I don't want to give

9    revenue share with Harbour in case of a sublicense; i.e., his

10   employer.  This is not in sight of Kali's interest, i.e., the

11   company in which he has an interest.

12        So, you know, I don't know if I can find a better

13   example of that, but the complaint is replete with examples of

14   email correspondence that demonstrate that he was acting in his

15   own self-interest to the detriment of my client, and the

16   transactions that he did not even bother to inform the company

17   about.  And Mr. Cutler says, well, those transactions never

18   reached the stage, and, you know, they weren't as good as the

19   other.  That's nice.  He has a duty to take back -- the same

20   way I have a duty to take back to my client an offer even if I

21   don't like it, he has a duty to take back to his employer

22   ginormous transactions, transactions that could generate

23   ginormous numbers in terms of financial terms.  And those are

24   all laid out in the complaint, what they were offering in the

25   first opportunity, what they were offering in the second

1    opportunity, where the third opportunity ends up landing, which

2    was not as good as one or two because, again, it was his own

3    self-interest.

4            Now, let me just address more specifically the various

5    points that were made by opposing counsel, again, to the extent

6    the Court feels I need to address them because I think, again,

7    as the Court has pointed out, all of these issues that Mr. Cutler

8    has raised really can't be decided in the context of a motion

9    to dismiss.  But with respect to issues like standing, he

10   signed an agreement with Harbour Antibodies.  But just to be

11   clear, what the complaint alleges and what the documents on

12   which Xu himself relies in his response, in his opposition to

13   the motion, show that he held several positions within the

14   Harbour entities, all of which are indirectly or wholly owned

15   subsidiaries of Harbour BioMed.  Harbour BioMed is defined in

16   the complaint to include the corporate subsidiaries, but either

17   way, Harbour BioMed had standing to pursue claims for breach of

18   fiduciary duty and breach of contract in addition to the other

19   claim.  And while Harbour Antibodies may not directly own the

20   assets, the plaintiffs allege that Harbour Antibodies was

21   involved in negotiations as Xu's direct employer, it's wholly

22   owned by BioMed; and when Xu elevated his own interest over

23   those of his employers, both plaintiffs were damaged, which

24   gives him standing to bring claims related to the assets.

25           Third, as to all of the grounds for dismissal, and

1    particularly addressed in the specific causes of action, he

2    raises numerous factual disputes.  It's black letter law that

3    those aren't properly dealt with on a 12(b)(6).  But this is a

4    very detailed complaint that cites specific conduct.  It

5    includes specific references to numerous oral and email

6    communication as factual predicates for the claim.  The

7    defendant, again, of course he's going to dispute them, and

8    that's what discovery and summary judgment are for.  But apart

9    from the employment offer letter, which your Honor I think

10   acknowledged is something that could be considered, there's

11   really nothing else to consider here.

12          And, again, on the issue of standing, I would quote

13   the offer letter which says, "We are pleased to confirm this

14   offer of employment to you to be (Inaudible) officer of Harbour

15   BioMed, HBM," one of the plaintiffs.  And then the employment

16   letter goes on to clarify that because of Xu's physical

17   location in the United States, his contract would be assigned

18   to Harbour Antibodies, but he was hired by HBM.  And the

19   complaint also includes, as we point out in papers, numerous

20   allegations concerning how Harbour BioMed operates, its close

21   relationship to the subsidiaries.  And so all --

22          THE COURT:  I need to wrap this up a little because I

23   have a hearing coming up, so --

24          MR. KARAGHEUZOFF:  That's fine, your Honor.  So let me

25   just cut to the chase.  With respect to all of the other causes

1    of action, I think at the heart of it, defendant's defense

2    seems to be, well, he was charged with responsibility to

3    oversee this stuff, so what's the problem?  And the answer

4    again is always that it's not a function of the fact that he

5    engaged in communications with other folks to try to negotiate

6    a transaction.  It's the fact that he has elevated his own

7    personal interests, which he did not disclose, over and above

8    those of his employers; and, again, the complaint is full of

9    instances and examples of this.

10          THE COURT:  Thank you.  Now, let's just move on to the

11   next step, which is, I'm not likely to dismiss this whole

12   complaint.  There may be a few causes of action that fly or

13   don't fly, but -- so I want to set up a discovery schedule, and

14   I don't want to spend a ton of money on this because I haven't

15   yet heard big damages, but maybe I don't understand the case

16   enough.  So have you given me a joint statement?

17          MR. CUTLER:  We have, your Honor.

18          THE COURT:  I'm not sure I --

19          THE CLERK:  Judge, you should have it.  I think Layla

20   or Sam gave it to you.  It should have a sticky on it that says

21   "joint statement."

22          THE COURT:  Yes, it may be out on the bench.  Okay,

23   thank you.  So I want to kick-start this and...  This looks

24   perfectly logical, so I accept this.  But the only thing that

25   I've got some concern about is, I would like you to try to

```
1    mediate this.  Is the defendant working now?

2             MR. CUTLER:  Yes, your Honor.

3             THE COURT:  When do you think it makes sense to try to

4    do mediation?

5             MR. CUTLER:  Really, at any point would make sense for

6    us.  And I did approach opposing counsel.  They were sort of

7    saying they want to get discovery, just put their case together

8    before they go into mediation.  So it would be difficult from

9    that perspective, but we're prepared at any point to sit and

10   talk.

11            MR. KARAGHEUZOFF:  Your Honor, I think it's going to

12   be hard to resolve this case without engaging in some discovery

13   first.

14            THE COURT:  Yes, yes.  So --

15            MR. CUTLER:  And there's one thing that I was remiss

16   in working on this that I should have asked for, and I

17   apologize.  I'm not trying to pull a fast one on counsel on

18   this --

19            THE COURT:  Excuse me.  Next summer, do you think that

20   would be enough time to --

21            MR. CUTLER:  Next when?

22            THE COURT:  Summer?

23            MR. CUTLER:  This coming summer?  Yes.

24            THE COURT:  All right, so Mem will send it to

25   mediation after --
```

 1          THE CLERK:  June, 2025?

 2          THE COURT:  Yes.

 3          MR. KARAGHEUZOFF:  Well, your Honor, document

 4    discovery doesn't end until June, 2025, and depositions on

 5    August 31st, so I think the better time to send us would be

 6    sometime after August 31st.

 7          THE COURT:  Okay, September?

 8          MR. KARAGHEUZOFF:  Yes, that's fine.

 9          THE COURT:  Okay.

10          MR. CUTLER:  That works good for the defendants, your

11    Honor.

12          THE COURT:  I interrupted you.  Is there one last

13    thing you wanted to say?

14          MR. CUTLER:  Yes.  Can we add to this order a

15    requirement for identification of the trade secrets if that

16    cause of action remains, so that if we have any discovery

17    disputes, you know how to deal with them because you know what

18    the trade secrets --

19          THE COURT:  Why don't you just shoot off an

20    interrogatory.

21          MR. CUTLER:  Oh, I will, but just it would be easier

22    if it was done in the initial disclosure.

23          THE COURT:  That's one of the questions I had.  I'm

24    going to go back through it when I look specific on trade

25    secrets.  I think there's enough for a breach of fiduciary

1   duty.  I mean, there are a couple of breach of contract,

2   blah-blah-blah, but I'll get some issues with fraud and whether

3   it's specific enough with respect to trade secrets.  But let me

4   just say this:  Give an interrogatory about what the trade

5   secrets are.

6           MR. CUTLER:  I will, your Honor.  Thank you.

7           THE COURT:  Okay, thank you.  All right, bye-bye.

8           MR. KARAGHEUZOFF:  Thank you.

9           (Adjourned, 10:13 a.m.)

1                        C E R T I F I C A T E

2


3
UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6


7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 29 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in CA No. 24-12724-PBS, HBM

11  Holdings Limited, et al v. Weihao Xu, and thereafter by me

12  reduced to typewriting and is a true and accurate record of the

13  proceedings.

14          Dated this 24th day of February, 2025.

15

16

17

18


19          /s/ Lee A. Marzilli
            _____
20          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
21

22

23

24

25