**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| HBM HOLDINGS LIMITED and HARBOUR ANTIBODIES U.S. INC., <br>    Plaintiffs, <br><br> v. <br><br> WEIHAO XU, <br>    Defendant. <br><br> WEIHAO XU, <br>    Third-Party Plaintiff, <br><br> v. <br><br> JINGSONG WANG, <br>    Third-Party Defendant. | Civil Action No. 1:24-cv-12724 |

**ANSWER OF WEIHAO XU AND THIRD-PARTY COMPLAINT**

Defendant Weihao Xu ("Defendant" and/or "Mr. Xu") respectfully submits his answer to Plaintiffs HBM Holdings Limited ("HBM") and Harbour Antibodies U.S. Inc.'s ("Harbour"), collectively hereinafter "Plaintiffs", complaint and third-party complaint against Jingsong Wang ("Mr. Wang").

**ANSWER**

Plaintiffs first paragraph of the Complaint contains statements not requiring a response. As such, denied.

**<u>INTRODUCTION</u>**

1.    Denied.

2.    Denied.

3.      Denied.

4.      Denied.

5.      Denied.

6.      Denied.

7.      Denied.

8.      Denied.

## PARTIES AND JURISDICTION

9.      Admit.

10.     Defendant has insufficient information to either admit or deny paragraph 10 of the Complaint; therefore denied.

11.     Admit.

12.     Denied.

13.     Denied.

14.     Admit.

## FACTS

### A.      Xu's Employment by Harbour[1]

15.     Admit.

16.     Admit.

17.     Denied.

18.     Denied.

### B.      Relevant Terms of Xu's NDA and Non-Competition Agreement

19.     Denied.

20.     Admit, the document speaks for itself.  Denied, as to any and all inferences.

---

[1]

21.     Admit, the document speaks for itself.  Denied, as to any and all inferences.

22.     Admit, the document speaks for itself.  Denied, as to any and all inferences.

**C.      Xu's Employment Duties and the Structure of the Contemplated Transactions**

23.     Admit.

24.     Admit.

25.     Denied.

26.     Denied.

27.     Denied.

28.     Denied.

**D.      Xu's Wrongful Conduct**

**1.      Xu Terminated Valuable Corporate Opportunities with REDACTED**

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

**2.      Creating An Investment Vehicle for Xu's Future Equity Interest**

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

### 3.     Securing a Term Sheet with REDACTED

42.     Denied.

43.     Denied.

44.     Denied.

### 4.     Further Covert Activities Related to Kali

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

### 5.     The *Partial* Disclosure to Harbour

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

### 6.     The Stock Purchase Agreement and Solicitation

54.     Denied.

55.     Denied.

56.     Denied.

### 7.     The Negotiations with Harbour and the April 21, 2024 Term Sheet

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

**E.     Xu's Termination from Harbour and its Post-Termination Investigation**

73.     Denied.

74.     Denied.

**F.     Current Status and Harbour's Damages**

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

**First Cause of Action**
**Breach of Fiduciary Duties – Duty of Loyalty**

79.    Defendant denies and admits this incorporating allegation in accordance with his other responses.

80.    Denied.

81.    Denied.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Denied.

**Second Cause of Action**
**Breach of Contract**

86.    Defendant denies and admits this incorporating allegation in accordance with his other responses.

87.    Admit.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

92.    Denied.

93.    Denied.

**Third Cause of Action**
**Interference with Advantageous Economic Relationships**

94.    Defendant denies and admits this incorporating allegation in accordance with his other responses.

95.    Denied.

96.    Denied.

97.    Denied.

98.    Denied.

99.    Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

**Fourth Cause of Action**
**Fraud**

105.    Defendant denies and admits this incorporating allegation in accordance with his other responses.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

**Fifth Cause of Action**
**Violation of the Defend Trade Secrets Act**
**(18 U.S.C. § 1836, et seq.)**

117.    Defendant denies and admits this incorporating allegation in accordance with his other responses.

118.    This is a statement of law, not fact.  To the extent it is a statement of fact, denied.

119.    This is a statement of law, not fact.  To the extent it is a statement of fact, denied.

120.    This is a statement of law, not fact.  To the extent it is a statement of fact, denied.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

<u>**FIRST AFFIRMATIVE DEFENSE**</u>
**Failure to State A Claim**

Plaintiffs fail to state a claim upon which relief can be granted.

<u>**SECOND AFFIRMATIVE DEFENSE**</u>
**Contributory Negligence**

Plaintiffs' claims are barred by contributory negligence.

<u>**THIRD AFFIRMATIVE DEFENSE**</u>
**Waiver**

Plaintiffs' conduct, actions and words constitute a waiver of their claims.

## FOURTH AFFIRMATIVE DEFENSE
### Laches

Plaintiffs are barred by the doctrine of laches, as a result of their conduct, from pursuing their claims.

## FIFTH AFFIRMATIVE DEFENSE
### Failure to Mitigate Damages

Plaintiffs failed to mitigate their claimed damages.

## SIXTH AFFIRMATIVE DEFENSE
### Estoppel

As a result of Plaintiffs' actions, Plaintiffs are barred from enforcing their claims.

## SEVENTH AFFIRMATIVE DEFENSE
### Breach of Contract

Plaintiffs' claims are barred because Plaintiffs are in breach of the parties' contract.

## EIGHTH AFFIRMATIVE DEFENSE
### Contributory Fault

Plaintiffs contributed to the damages sought by way of the present action.

## NINTH AFFIRMATIVE DEFENSE
### Unclean Hands

Plaintiffs are barred from recovering on their claims as they acted with unclean hands.

## TENTH AFFIRMATIVE DEFENSE
### Authorization

Plaintiffs authorized Defendant to take the actions for which they are now suing.

## ELEVENTH AFFIRMATIVE DEFENSE
### Modification of Contract

Plaintiffs modified any and all agreement between the parties.

## TWELFTH AFFIRMATIVE DEFENSE
### Reservation of Rights

Defendant reserves any additional and further defenses as may be revealed during discovery or upon the receipt of additional information.

## PRAYER FOR RELIEF

Defendant prays for the following relief:

a.    That Plaintiffs take nothing by way of this action;
b.    Defendant be awarded his attorneys' fees and costs; and
c.    Any remedy the Court deems just and equitable.

## REQUEST FOR TRIAL BY JURY

Defendant respectfully requests that this matter be tried by a jury.

## THIRD-PARTY COMPLAINT

PREFATORY ALLEGATIONS

1.    Third-Party Plaintiff Weihao Xu ("Mr. Xu") is a resident of Belmont, California.

2.    Third Party Defendant Jingsong Wang ("Wang") is a resident of Wayne, Pennsylvania.

FACTUAL ALLEGATIONS

3.    Mr. Wang is the Chief Executive Officer of plaintiff Harbour Antibodies U.S. Inc. ("Harbour").

4.    Mr. Wang is the Director and Chairman of non-party Nona Biosciences Suzhou ("Nona").

5.    Mr. Wang is the Director of plaintiff HBM Holdings Limited ("HBM").

6.    On or about December 1, 2021, Mr. Xu commenced working for Harbour reporting directly to Mr. Wang.

7.    Mr. Xu was hired by Harbour as its Chief Strategic Officer. As set forth in his offer of employment, Mr. Xu's duties and responsibilities included: "Serves as the Global Head of Corporate Development to develop and execute strategy for corporate investment opportunities, build and develop innovation and business ecosystem fits the needs of Company growth; involve in other Company key functions such as product portfolio strategy, IR and BD activities especially in the US."

8.    As part of his employment, Mr. Xu received direction from and reported directly to Mr. Wang.

9.    Mr. Xu did not report to the boards of Harbour, Nona or HBM.

10.   When Mr. Xu first commenced working for Harbour, the bioscience pharmaceutical compound HBM7020-BCMAxCD3 (the "Compound") was a poorly structured and incomplete compound intended for the creation of oncology drugs.  At a minimum the Compound needed further development in order to serve as a platform for the development of oncology drugs. The Compound had not been tested in human subjects and a pre-clinical study showed significant toxicity in animals.  Because the marketplace for oncology drugs was saturated and the efficacy and usefulness of the Compound was subpar, Nona, Harbour and HBM considered the Compound valueless and removed it from their offerings as reflected on their website.

11.   After Mr. Xu commenced working for Harbour, he took a second look at the Compound, and after discussions with Mr. Wang, it was determined that Compound had potential value as a basis for the development of autoimmune drugs. Accordingly, Mr. Wang authorized the Compound to be rebranded and marketed as an autoimmune compound.

12.  In 2024, there was heightened activity in the bioscience's community with respect to the development of autoimmune drugs. As a result, the rebranding of the Compound caught the attention of a number of potential investors.

13.  The first investor group that expressed interest in the Compound was ███████████ ███████████ was introduced to Harbour by way of a bioscience broker, Conexus Bio a/k/a Sinogen Bio ("Sinogen"), with whom Mr. Wang had a long-standing relationship.

14.  Mr. Xu did not become aware of the existence of Sinogen or the agreement that Harbour had signed with Sinogen until sometime in January of 2024.

15.  The ████ opportunity, referred to as the first opportunity in the Complaint [**Docket 1**], started in December of 2023 and was originally handled by individuals other than Mr. Xu at Harbour under the direction of Mr. Wang.

16.  On January 5, 2024, when traveling to San Fransico to attend the JPM conference, Mr. Wang meet with Mr. Xu and asked Mr. Xu to become involved in the negotiations with ████ because of the complexity of the deal and the insufficient skill sets of those at Harbour involved in the deal.

17.  After Mr. Xu joined the negotiating team, which was overseen by Mr. Wang, ████ was requested to provide a term sheet.

18.  ████ provided a non-binding term sheet whereby it offered ███████████████ Dollars, consisting of a combination of cash and equity, for the Compound.

19.  Mr. Xu reviewed the contents of the term sheet with Mr. Wang, and Mr. Wang immediately rejected the offer, expressing that he, Mr. Wang, thought the offer was unacceptable and "too cheap".

20.  Mr. Xu advocated to continue to engage ████ in hopes of bringing about a deal that would be acceptable to Mr. Wang.

21.  Mr. Wang authorized Mr. Xu to make a counteroffer to ████

22.  Mr. Xu made the counteroffer to ████ the parameters of which Mr. Wang had approved and authorized.

23.  ████ did not respond to the counteroffer and Mr. Wang did not direct Mr. Xu to further engage with ████

24.  At this time, Mr. Wang and Mr. Xu discussed other ways of raising investment capital for the development of the Compound. One of the ideas considered was the setting up of a

NewCo whereby Harbour would solicit investors to invest in the NewCo to develop the Compound.

25.    Mr. Wang directed Mr. Xu to pursue the NewCo model.

26.    Accordingly, Mr. Xu reached out to the investing community and solicited investment in NewCo for the development of the Compound.

27.    Mr. Xu pitched the Compound to groups of investors, including ███████████ Abingworth, Orbited, TPG, Novo Holdings.

28.    On January 25, 2024, Mr. Xu met Mr. Wang in Pennsylvania while attending a partner meeting.

29.    During their meeting on the January 25th Mr. Wang again impressed upon Mr. Xu the need to form a NewCo.

30.    On the evening of January 25th, Mr. Wang awarded Mr. Xu, before the company as a whole, the "Presidential Award of Best Performance". In accepting the award, Mr. Xu discussed the company's efforts to utilize the NewCo model for raising investment capital.

31.    On February 7th, Mr. Wang and Mr. Xu met in Newton, Massachusetts to discuss Mr. Xu's efforts to raise investment monies for the various compounds that Mr. Wang was overseeing for Nona and Harbour.

32.    While talking with ██████████ regarding possible investment in another of Harbour's compounds, Mr. Xu mentioned the Compound. ██████████ responded that one of the companies it invested in, ██████████ might be interested in the Compound. This is referred to as the second opportunity in the complaint [**Docket 1**].

33.    ██████████ introduced ████ to Mr. Xu in late January or early February while Mr. Xu was in Massachusetts.

34.    From the start, there were red flags with ████. First, ████ did not have the money to purchase or invest in the Compound and second it was in the process of being acquired.

35.    ████ could not explain how it could overcome these hurdles in order to purchase and/or invest in the Compound.

36.    ████ provided a term sheet for ██████████████████ Dollars, cash and equity, with ████ being granted an exclusive negotiation period that would have prevented Harbour from discussing the Compound with other potential investors.

37.    During their weekly meeting, Mr. Wang and Mr. Xu discussed ████ proposal.

38.    Mr. Wang authorized and directed Mr. Xu to make a counteroffer to ████

39.  In doing so, Mr. Wang made it clear to Mr. Xu that he, Mr. Wang, required that any deal with ████ would involve a NewCo.

40.  Pursuant to Mr. Wang's directives, Mr. Xu sent ████ the exact same counteroffer that Harbour had sent ████

41.  As with ████████ did not respond and Mr. Wang did not direct Mr. Xu to follow up with ████

42.  From February 17ᵗʰ and the 23ʳᵈ, Mr. Xu was in China hosting AstraZeneca's visit to China. During this trip, Mr. Xu met with Mr. Wang and other senior members of Harbour to discuss the NewCo strategy. During the meetings with senior management, the ████ opportunity was discussed and Mr. Wang was averse to moving forward on a deal with ████

43.  During the same trip, Mr. Wang organized a dinner on February 23ʳᵈ. The dinner was attended by ten members of the senior management of Harbour and affiliated entities. Before this group of senior management, Mr. Wang reiterated that one of Mr. Xu's primary tasks was to build a NewCo.

44.  On February 26, 2024, Mr. Xu traveled to New York City where he met with Mr. Wang and updated him on his communications with investors and efforts to raise investment capital.

45.  At this time, the NewCo to be formed was referred to as Cytokali.

46.  During the last week of February or the first week of March 2024, Mr. Xu had his first interactions with ████████ referenced in the Complaint as the third opportunity. [**Docket 1**].

47.  ████████ expressed both a willingness and interest in using Cytokali as an investment vehicle for the development of the compound.

48.  ████████ agreed to lead the investors in the licensing/acquisition of the Compound and the Compound's development.

49.  ████████ proposed issuing an initial term sheet as a means of attracting other investors.

50.  On or around March 10ᵗʰ, a term sheet from ████ was received and the terms were immediately communicated by Mr. Xu to Mr. Wang.

51.  Mr. Wang responded in writing that "Great! The figures and terms are within our range?" Mr. Xu responded in writing "Yes. ██ raised. HMB ████ equity plus ██ cash"

52.  On March 12, 2024 Mr. Wang and Mr. Xu discussed the terms of the ▮▮▮▮▮▮ opportunity and the formation and use of Kali, the NewCo that was previously called Cytokali, including Mr. Xu leading Kali.

53.  At the conclusion of the March 12th meeting, Mr. Wang green lighted the deal and directed Mr. Xu to move forward with the forming of the NewCo, which became known as Kali.

54.  Mr. Xu recommended to Mr. Wang that he, Mr. Xu, step down from his position at Harbour in that he would be leading Kali.

55.  Mr. Wang insisted that Mr. Xu not resign from Harbour.  Mr. Wang wanted Mr. Xu to remain at Harbour to complete the deal with AstraZeneca, as well as completing and the litigating financing for the Amgen litigation, litigation that was driving the company towards insolvency.

56.  On March 13th ▮▮▮▮ committed to invest in the Compound, but would not be bound by the term sheet submitted by ▮▮▮▮▮▮

57.  Also, on March 13th Mr. Xu arranged meetings between Mr. Wang and the confirmed investors in this third opportunity, including ▮▮▮▮▮▮ from ▮▮▮▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮ from ▮▮▮▮

58.  On March 16th, Mr. Xu engaged in discussions with Harbour's general counsel Bruce Zhang ("Attorney Zhang"), as well as Qian Wang ("Q. Wang"), Harbour's IP Specialist, regarding the prospective deal, including the creation and use of Kali.

59.  Both Attorney Zhang and Q. Wang reported directly to Mr. Wang.

60.  A focus of these discussions was Mr. Xu's concerns about conflicts arising from the use of a NewCo as contemplated by Mr. Wang.

61.  Mr. Xu identified two conflicts that he foresaw.  First, Mr. Xu represents Kali and investors to negotiate with Nona with respect to the Compound while Mr. Xu was employed by Harbour.  The second conflict being the law firm of Ropes & Gray represents Kali to negotiate with Nona while Ropes & Gray represents Nona on the deal involving AstraZeneca.

62.  Attorney Zhang responded that he would run the potential conflicts by their outside, general counsel, Skadden Arps.

63.  On March 17th, following two further discussions, Attorney Zhang asked the following question in writing: "This is how I understand; You [Mr. Xu] start Kali, investors invest into Kali, then Kali license in HBM7020 one of the programs."

64.  Attorney Zhang subsequently communicated that there would be no conflict if Harbour did not pay Kali's legal expenses.

65.  Accordingly, Kali went forward without financing from Harbour.

66.  Concurrently, Mr. Xu inquired as to ███ and ████████ where they would prefer to see Mr. Xu positioned in the deal. Both █████ and ██████ expressed their desire that Mr. Xu represent Kali.

67.  Ropes & Gray obtained a waiver of conflicts from Nona, which was executed by Attorney Zhang under the direction of Mr. Wang.

68.  On March 21st, Mr. Xu engaged the law firm of KL Gates to form Kali Therapeutics ("Kali").

69.  On March 24th, Mr. Xu updated Harbour's board member, Bob Kaman, on the formation of Kali and the progression of the deal with ██████████ and ██████

70.  Around March 24th, Mr. Xu asked Mr. Wang to designate someone at Harbour to represent Harbour and Nona in negotiations with Kali. Mr. Wang complied and designated Jiyong Zhang ("J. Zhang"). Concurrently, Attorney Zhang engaged Goodwin Proctor to represent Nona in the negotiations with Kali.

71.  Kali was formed with the full knowledge and at the direction of Mr. Wang, as well as Harbour's in-house counsel, Attorney Zhang.

72.  At all times Mr. Wang knew and consented to Mr. Xu receiving equity in Kali.

73.  Mr. Wang understood and acknowledged that the creation and use of Kali was critical to the success of raising capital to develop the Compound.

74.  Mr. Wang knew and consented to Mr. Xu being President and CEO of Kali.

75.  On April 5th Mr. Wang met with Mr. Xu in San Diego during an AACR conference, and Mr. Wang expressed his enthusiasm for Kali and Mr. Xu leading Kali.

76.  On April 6th, Mr. Wang met with two committed investors: ████████████████ Mr. Wang continued to express his enthusiasm and his full support behind Kali and Mr. Xu.

77.  On April 11th, following the AACR conference, Mr. Wang flew to San Francisco where he met with other committed investors, as well as Kali's legal counsel, KL Gates in Palo Alto. During the meeting with Kali's legal counsel, Mr. Wang and Kali's counsel discussed the structure of Kali. In the meeting with ██████████ of ████████████ thanked Mr. Wang for allowing Mr. Xu to lead Kali and the investment process. In response, Mr. Wang expressed his appreciation and approval of █████████ comments.

78.     On April 11, 2024, Mr. Wang, as Director of Nona, executed a Mutual Confidentiality Agreement between Nona and Kali.  Mr. Xu, as CEO of Kali, executed the same document.

79.     Mr. Wang positioned himself to receive equity in Kali as the "Chief Scientific Advisor" of Kali.

80.     Mr. Wang thanked investors and Mr. Xu for creating Kali and expressed how Kali was an important platform to realize the value of the Compound.

> I too truly enjoyed our conversations during my visit to the Bay area. Thank you for your strong support in driving the formation of Kali Therapeutics. It is an important platform to realize the value of Harbour and Nona's innovation and technology and more importantly, a conduit to synergize our shared mission to improve the lives of patients in need.
>
> I would be delighted to serve as the Chief Scientific Advisor role at Kali Tx. Look forward to our continued collaborations.  [**Docket 25-5**]

81.     Mr. Xu e-mailed Mr. Wang thanking him for his support of Kali and included a copy of the Scientific Advisor Agreement that they had discussed the previous day.

> Hi Jingsong,
> Thanks again for encouraging and supporting Kali to this far.  I look forward to continuing to work with you closely to maximize value for Kali and Harbour/Nona team.
> Attached please find the chief scientific advisor agreement we discussed yesterday. … [**Docket 25-6**]

82.     On April 21, 2024, Mr. Wang executed, as Chairman of the Board of Directors of Nona, a term sheet between Nona and Kali. Mr. Xu executed the same document as CEO of Kali.

83.     On May 10th, an in person, six-hour, negotiation between Kali and Harbour/Nona were conducted at the law firm of Ropes & Gray. J. Zhang, as designated by Mr. Wang, represented to Harbour/Nona.

84.     On May 24th, drafts of the financing documents were circulated and provided to counsel for Harbour/Nona, along with a Cap Table.

85.     On May 25th, Mr. Xu presented Mr. Wang with the amount of equity he, Mr. Wang, would receive as the Chief Scientific Officer of Kali.

86.     As of May 25th, Mr. Wang thus became aware of how much equity he was to receive as the Chief Scientific Officer and how much equity Mr. Xu was to receive as the CEO.

87.     Mr. Wang began distancing himself from Mr. Xu.

88.    Mr. Wang commenced being non-committal on closing the deal.

89.    On May 29th, Harbour's PR team, under the direction of Mr. Wang, circulated a press release representing that Harbour launched Kali.

90.    On June 7th, Mr. Wang terminated Mr. Xu's employment without explanation.

91.    On June 13th, Attorney Zhang negotiated additional cash payments under the deal for Harbour/Nona.

92.    Harbour continued to negotiate with Kali, with Mr. Xu as Kali's CEO.

93.    On June 24th, Mr. Wang went to the board and requested the termination of the deal with Kali.

94.    At this time, there was an exclusive negotiation period in place.

95.    On June 27th, Attorney Zhang under the direction of Mr. Wang, wrote to Mr. Xu, in Mr. Xu's capacity of CEO of Kali, terminating Harbour's involvement in the proposed deal.

96.    Mr. Wang's plan was to terminate the deal with Kali and terminate Mr. Xu's employment, wait out the expiration of the exclusive negotiation period and then to reach out to the investors himself and reconstitute the deal, placing himself as the Chairman of the Board of the NewCo and receiving a greater percentage of the equity than he was granted as the Chief Scientific Officer.

97.    Consistent with his plans, after the expiration of the exclusive negotiation period, Mr. Wang personally reached out to the investors seeking to reconstitute the deal with himself as the head of NewCo.

98.    Consistent with this plan, on or about July of 2024, Mr. Wang wrote directly to the investors stating:

> This is to give you an update on a potential licensing deal that the Company was exploring with Kali Therapeutics (a/k/a CytoKali). We were negotiating, in good faith, with Kali regarding Harbour BioMed (HBM) assets including T cell engager BCMAxCD3. At the advanced phase of the transaction process, numerous irregularities were identified that forced us to suspend discussions. Following further internal investigation, Mr. Weihao Xu was separated from the Company earlier in June 2024. Due to these compliance issues, HBM has decided not to proceed with the transaction as originally intended and will disengage with any further business engagements with Kali. In the meantime, we remain committed to working with you to maximize the value of HBM's innovative programs, including the aforementioned ones and beyond. Should you have an interest in discussing our collaborations further, please let us know. My colleague Youchen Chen – Head of Corporate Development at HBM (email

cc'd) will be responsible for coordinating the effort. We would be delighted to set up a call to catch up. Thank you for your understanding and continued support.
Regards, Jingsong

99.   It had become standard practice for Mr. Wang to position himself to receive large equity interests in NewCos formed to monetize the compounds belonging to Plaintiffs and Nona.

100.  Most recently, a NewCo, known as HBM Alpha Therapeutics, Inc. ("HBM Alpha") was formed to monetize another of Plaintiffs' compounds.

101.  In addition to HBM Alpha, Mr. Wang acquired for his personal benefit 10-20% of the equity in the Harbour NewCos known as Shanghai NK Cell Technology Limited and Elance Therapeutics

102.  Mr. Wang positioned himself to personally receive 20% of the equity in HBM Alpha.

103.  If there is any wrongdoing found against Mr. Xu by way of Plaintiffs' complaint, Mr. Wang is contributorily liable for that wrongdoing.

## **COUNT I**
### **Contribution**
### **G.L.c. 231B § 1 et seq.**

104.  Third-Party Plaintiff repeats and re-alleges each and every allegation as though each were separately and specifically set forth herein.

105.  As set forth above, all of the acts taken by Mr. Xu were at the direction of and authorized by Mr. Wang.

106.  If either plaintiff is able to prove a legal wrongdoing, and in fact there are damages arising therefrom, Mr. Wang contributed to bringing about those wrongdoings and therefore is jointly liable for any damages.

107.  Mr. Xu thus has a right of contribution from Mr. Wang.

108.  The amount of contribution shall be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Third-Party Plaintiff prays that this Court grant the following relief:

a.   Judgment against third-party defendant;

b.   Damages, including compensatory, liquidated, and trebled damages to Plaintiff, as authorized and mandated by applicable law, in an amount to be proven at trial;

c.   Pre-judgment and post-judgment interest;

d.   Attorneys' fees and costs;

e.   Appropriate injunctive, declaratory and other equitable relief; and

f.   Grant such other and further relief as this Court deems just and proper against defendants and reach and apply defendants.

## REQUEST FOR TRIAL BY JURY

Third-Party Plaintiff hereby requests that this action to be tried by jury.

**DATED: March 24, 2025**

**DEFENDANT,**
Weihao Xu
By his attorneys,

/s/ Connie C. Dai

Connie C. Dai (BBO#683330)
Yun Cheng (BBO# 707028)
Lion's Law, P.C.
154 Wells Ave
Newton, Massachusetts 02459
(617) 682-7111 Telephone
(617) 307-3515 Fax
connie@lionslawgroup.com
yun@lionslawgroup.com

/s/ Timothy K. Cutler

Timothy K. Cutler (BBO#636124)
CUTLER & WILENSKY LLP
20 Walnut Street, Suite 1
Wellesley, Massachusetts 02481
(617) 232-7500 Telephone
tim@cutlerlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed through the CM/ECF system and will be electronically sent to the registered participants as identified on the Notice of Electronic Filing (NEF) on this March 24, 2025.

/s/ Timothy K. Cutler

Timothy K. Cutler