| | |
|---|---|
| HBM Holdings Limited, Harbour Antibodies U.S. Inc., and Harbour BioMed (Shanghai) Co., Ltd., <br><br>             Plaintiffs, <br><br> vs. <br><br> Weihao Xu, <br><br>             Defendant | Case No. 24-cv-12724 |
| WEIHAO XU, <br><br>             Third-Party Plaintiff, <br><br> v. <br><br> JINGSONG WANG, <br><br>             Third-Party Defendant | |

## AMENDED COMPLAINT

Plaintiffs HBM Holdings Limited ("Harbour BioMed"), a Cayman corporation, Harbour Antibodies U.S. Inc. ("Harbour Antibodies"), a Massachusetts corporation, and Harbour BioMed (Shanghai) Co., Ltd., a China corporation, ("HBM Shanghai") (collectively "Harbour") allege the following against Defendant Weihao Xu ("Xu").

## INTRODUCTION

1.     Through its various wholly-owned subsidiaries, Harbour has invested substantial resources into developing an impressive portfolio of bioscience technology and assets, providing therapies for diseases with unmet medical needs, and building a strong reputation in the industry.

2.     Harbour trusts in and relies on its senior executives to advance its business plans. It expects them to discharge their responsibilities consistent with their duties of loyalty to the company and with integrity and transparency. Harbour brings this lawsuit against Xu, a former officer, who failed to do this; he did the opposite.

3.     While working for Harbour in various C-suite roles and drawing a substantial salary and benefits, Xu devised a scheme to create a side-business venture in which he would secretly own an equity interest. He then attempted to license Harbour's assets, through this new company, for his own wrongful benefit.

4.     During the relevant time period in early 2024, Xu evaluated Harbour's business opportunities according to the criteria of what would benefit him personally. He steered Harbour away from lucrative and advantageous opportunities because those deals would not maximize his own financial benefit, and instead pursued and negotiated deals that would provide him undisclosed financial benefits, regardless of Harbour's interest.

5.     Eventually, Xu agreed to term sheets by which Harbour would license certain assets, falsely representing to investors that he had approval from Harbour's Board and management. He also created email accounts for his new company, registered those email accounts as administrators for Harbour's data room, incorporated the new company in the United States, and attempted to recruit at least two other Harbour executives to eventually join him at his new company.

6.     Although his plan was uncovered before any term sheets progressed into consummated deals, Harbour was damaged by Xu's conduct. It lost out on business opportunities that Xu declined based on his own self-interest. It lost the benefits that would have been realized had it not been for Xu's self-dealing, as well as incurring damage to its business reputation with investors because Harbour could not proceed with the terms that were secretly negotiated by Xu and had to abruptly terminate a transaction. And it has lost the compensation paid to Xu while he was engaged in such blatantly wrongful conduct.

7.     After some of Xu's wrongful conduct came to light, Harbour terminated Xu. In his final hours at the company, to try to cover his tracks, Xu, who it appears did not realize that company emails are archived and could be recovered, attempted to delete emails from his Harbour email account. As is often the case, the emails tell the story.  Here, that story is of an

executive acting in disregard of his fiduciary duties, hiding his improper conduct, and attempting to cover up his wrongdoing so as not to be discovered.

8.    Through this lawsuit, Harbour seeks to recover damages caused by, and obtain other relief relating to, Xu's wrongful conduct.

## PARTIES AND JURISIDCTION

9.    Harbour BioMed is a Cayman corporation, with a U.S. business unit that operates primarily in and around Boston, Massachusetts. It is publicly-traded in Hong Kong.

10.    Harbour Antibodies is a Massachusetts corporation, with its principal place of business in Natick, Massachusetts.  Harbour Antibodies is a wholly-owned subsidiary of Harbour BioMed.

11.    HBM Shanghai is incorporated in the People's Republic of China, with its principal place of business in Shanghai, China.  HBM Shanghai is an indirectly wholly-owned subsidiary of Harbour BioMed.

12.    Xu is an individual who, on information and belief, is a resident of California. At all times material to this Complaint prior to his termination, Xu worked for Harbour on a remote-basis in and around San Francisco, California.

13.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 and § 1338 because this case arises under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836 et seq.) and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims asserted herein are related to the same controversy.  The Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000.

14.    This Court has personal jurisdiction over Xu.  Pursuant to his EMPLOYEE PROPRIETARY INFORMATION, INVENTIONS, NON-COMPETITION AND NON-SOLICITATION AGREEMENT (the "NDA and Non-Competition Agreement"), he expressly consented to this Court's jurisdiction (Section 13.1). The claims herein arise from and/or are related to the NDA and Non-Competition Agreement.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and § 1400 because, as described herein, the actions that give rise to the allegations of this Complaint occurred in this district.

## FACTS

**A.     Xu's Employment by Harbour[1]**

16.     On November 18, 2021, Xu signed an employment offer letter and the NDA and Non-Competition Agreement with Harbour Antibodies, both of which contain a "time and attention" provision that made clear that Xu "will be expected to devote [his] full time and effort to the business and affairs of the Company."

17.     Since around that time, Xu has held various positions within Harbour, including CSO (Chief Strategy Officer), CBO (Chief Business Officer) and CFO (Chief Finance Officer) of Harbour, and President of Harbour's business unit in the United States.

18.     Xu reported to the CEO of Harbour. Xu was also a member of Harbour's Executive Committee and had full access to Harbour's business plans and strategies. Xu's responsibilities included serving as the Global Head of Business Development, with his duties being focused primarily in the United States.

19.     As an officer, Xu owed fiduciary duties to Harbour.

20.     As an employee of Harbour that was located in the United States, Xu was also subject to certain Harbour policies and procedures, including but not limited to the HBM Holdings Limited U.S. Employee Handbook, Harbour's Corporate Expense Policy, Harbour's Conflict of Interest Policy, and Harbour's Record Management Standard Operating Procedure.

---

[1] Harbour BioMed is a holding company which does not directly hire any employee or directly hold intellectual property. Rather, Harbour BioMed hires employees to operate businesses that hold Harbour's assets through its various subsidiaries located mainly in the United States and China. All financial results of its subsidiaries are consolidated into Harbour BioMed's financial results. Therefore, any benefits to or damages sustained by Harbour BioMed's subsidiaries inure to Harbour BioMed. For this reason and the sake of simplicity, "Harbour" also refers to Harbour BioMed's other subsidiaries and their respective operating business and assets as a whole, where appropriate.

**B.      Relevant Terms of Xu's NDA and Non-Competition Agreement**

21.      The NDA and Non-Competition Agreement contains key provisions that govern Xu's conduct.

22.      In Section 1.1 of the NDA and Non-Competition Agreement, Xu agreed that:

> At all times during my employment with the Company and thereafter, I will hold in strictest confidence and will not disclose, use, or publish any of the Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns.

23.      "Proprietary Information" is defined in Section 1.2 of the NDA and Non-Competition Agreement and includes, but is not limited to, the following (emphasis added):

> (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, **future plans and potential strategies**, financial projections and business strategies, operational plans, **financing and capital raising plans**, **activities and agreements**, internal services and operational manuals, methods of conducting business, suppliers and supplier information, and purchasing;
> (c) information regarding Customers or Potential Customers …;
> (d) information regarding any of the business partners of the Company and the services of such business partners, including their names and their representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners;
> (e) information regarding personnel, employee lists, compensation, and employee skills; and
> (f) **any non-public information which a competitor of the Company could use to the competitive disadvantage of the Company**.

24.     Xu also agreed to the Duty of Loyalty that he owed to Harbour in Section 4 of the

NDA and Non-Competition Agreement:

> I understand that my employment with the Company requires my full
> attention and effort. I agree that during the period of my employment
> by the Company I will not, without the Company's express written
> consent, engage in any employment or business activity other than for
> the Company, including but not limited to employment or business
> activity which is competitive with, or would otherwise conflict with,
> my employment by the Company.

**C.     Xu's Employment Duties and the Structure of the Contemplated Transactions**

25.     For many years, apart from an IPO, biotech companies traditionally raised money

and obtained revenue by licensing assets (normally drug compounds) to other biotech companies

or large pharmaceutical companies. Typically, licensing transactions in this space included some

or all of the following components: upfront payments, payments conditioned on certain

milestones, and future royalties.

26.     Recently, biotech companies have been pursuing an alternative approach by

which they partner with venture capital firms or other investors to create a new corporate entity

that is the licensee of the assets, ensuring that the biotech licensor holds a substantial equity

interest in the new entity and will be duly rewarded should the assets succeed past critical

milestones and become viable therapies. This approach is commonly referred to as a "newco

model."

27.     Harbour has an interest in exploring opportunities using this newco model, rather

than the more limited license-only model. In late 2023, Harbour tasked Xu to find interested

venture capital firms or other investors to partner with Harbour in licensing Harbour's assets

using a newco model.  It was essential to Harbour that it receive the highest return that could be

negotiated for its assets, comprising two forms: (i) a cash payment from licensing the assets to

the newco, and (ii) an equity interest in the newco as its co-founder and key contributor of assets.

28.     In early 2024, Xu was specifically tasked with exploring such opportunities

relating to Harbour's emerging assets portfolio, including one that was referred to as

██████████████████████████████████ together with other assets in the portfolio, collectively, the "Assets").

29.     In representing Harbour's interests in these transactions, Xu was expected to present all proposed term sheets to Harbour's CEO and Legal Department for review and consideration prior to acceptance or rejection.

30.     Consistent with the newco structure outlined above, Harbour anticipated that it would hold a significant equity interest in the newco along with the investors, and receive a meaningful cash payment from the newco as well.  Harbour further expected that Xu, acting for Harbour's interests, would eventually become the CEO of the newco.  Xu also understood this plan and business arrangement.

**D.     Xu's Wrongful Conduct**

   **1.     Xu Terminated Valuable Corporate Opportunities with ███████████████**

31.     In or about late January 2024, █████████████████ ("First Opportunity") sent Xu a term sheet ("First Opportunity Term Sheet") relating to ████████, which included ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, and royalty percentages.

32.     In derogation of his duties, Xu neither forwarded the First Opportunity Term Sheet nor otherwise made Harbour aware of this business opportunity.  Instead, Xu effectively terminated negotiations with First Opportunity in February 2024 by deliberately making a counter-offer that he knew would kill the discussions. In response to First Opportunity's proposal of a █████████████████████████████████████████████████████████ ██████████████████████████████████ In response to First Opportunity's proposal of subsequent milestone payments ████████████████████████████. Xu knew that First Opportunity would deem these demands exorbitant and would end negotiations.

33.     Around the same time (February 2024), Xu did much the same with ██████ ("Second Opportunity"), another potential licensee that also had an interest in ██████. Xu proposed the same ██████ upfront payment and elevated milestone payments to Second Opportunity.  Second Opportunity countered with a term sheet to Xu ("Second Opportunity Term Sheet") offering Harbour: (i) an upfront payment of ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████.

34.     Xu responded to this counter by telling Second Opportunity: "the upfront, near-term payments and royalties are all significantly lower than my other offer" and "need to be significantly higher", and that the Harbour Board would not be interested.  He did so even though he never presented this offer to the Board. On information and belief, Xu never received an offer better than Second Opportunity Term Sheet.

35.     On information and belief, Xu failed to represent Harbour's interest in the negotiations with First Opportunity and Second Opportunity because of his own self-interest.  He purposefully extinguished negotiations with First Opportunity and Second Opportunity, because, even as early as February 2024, Xu planned to carve out an equity position for himself in a newco and pursue negotiations with other investors that he believed would be more amenable to a deal structure that allowed him to personally profit.

36.     Xu's self-interest was apparent when he sent his counter-offer to the First Opportunity Term Sheet ██████████ to his preferred investor on February 8, 2024, with the following message: "This is a live TS that I have shared with two separate syndicate groups[2]. The upfront is quite significant to protect the downside for Harbour to give out the program at

---

[2] On information and belief, Xu is referring to First Opportunity and Second Opportunity.

this stage. **If we were to work together with my preferred syndicate**, **I am open to negotiating the terms**. **Our interest will be aligned if my team have exposure to the future success of the program**." (Emphasis added.) The fact that Xu was willing to negotiate with (and presumably accept lower financial contributions from) his preferred investor, but not from an investor whose offer would be beneficial to Harbour, and the fact that Xu was advocating for "his team" to have exposure to the future success of the program (likely through stock ownership) instead of Harbour, both reveal Xu's intention to benefit personally and to benefit his preferred investors at the expense of Harbour.

37.     Xu knew that it would be difficult, if not impossible, to reach his preferred, self-interested deal with First Opportunity without Harbour's knowledge and approval because First Opportunity had a prior relationship with the CEO and others at Harbour.

38.     Xu also knew that his self-dealing would likely not work with Second Opportunity because Second Opportunity's structure was for it to be the licensee (not a separate newco Xu planned to set up by himself), and Second Opportunity already had a management team in place. Thus, Xu knew it would be difficult for him to be named as the CEO of Second Opportunity or own an equity interest in that entity as a founder. Thus, he effectively terminated the Second Opportunity negotiations for much the same reasons as he terminated the negotiations with First Opportunity—his own financial interests.

39.     With those corporate opportunities killed and buried in early February, Xu next set out to find an investor/licensee that would be more accepting of a transaction that would allow him to personally benefit.

### 2.     Creating An Investment Vehicle for Xu's Future Equity Interest

40.     In the weeks that followed the termination of the First Opportunity and Second Opportunity discussions, Xu began to focus on setting up a transaction with investors that he favored and would facilitate his plan of self-dealing.  In pursuit of the same, he circulated several deal proposals with financial terms similar to or less favorable to Harbour than the Second Opportunity Term Sheet.

41.     Each of these deal proposals had one common feature—the investment vehicle would be through an entity that he planned to form, which he referred to as "Kali" or CytoKali," and in which Xu would own an equity interest. In short, Xu focused all of his energies on ensuring that the transaction was done through his Kali/CytoKali entity rather than negotiating the best financial terms for Harbour, because this would provide (i) Xu with an ownership interest in the newco entity as its founder; and (ii) lower payments to Harbour so that his Kali/CytoKali entity could preserve cash to fund his development of the Assets licensed from Harbour.

42.     Xu understood that pursuing such an arrangement created a clear conflict of interest with Harbour; he even acknowledged as much in communications with two co-lead investors (as detailed below).  Xu stated: "To act on behalf of Kali, I might need to resign from Harbour first to make it conflict free."  But Xu did not resign from Harbour, nor did he disclose these facts to Harbour. Rather than fully disclosing this information, he continued to act in a covert manner in order to control the communication with potential investors.

43.     Xu continued to lead Harbour to believe that he was negotiating the best deal possible for Harbour and its incubated newco, maximizing the return on the Assets. He failed to disclose that he was trying to secure an undisclosed equity interest in the newco, and other financial benefits, for himself.

### 3.     Securing a Term Sheet with █████

44.     After engaging in various secret communications with potential investors and evaluating and circulating term sheets on his own for several weeks, on or around March 11, 2024, Xu and ████████ ("Co-Lead Investor A") signed a term sheet ("Co-Lead Investor A Term Sheet"), whereby Co-Lead Investor A would invest ██████████ in a newco as a co-lead investor. As he had planned all along, this deal was done through and on behalf of CytoKali, the entity of which Xu claimed to be the CEO and Founder.  (He signed the Co-Lead Investor A Term Sheet before a newco had been incorporated, and when the newco was officially formed, he used the name Kali Therapeutics, Inc.)

45.     Xu's emails confirm he was fully aware that the deal he was negotiating with Co-Lead Investor A was better for Kali, but was not better for Harbour than the deal he had effectively rejected from Second Opportunity.  On March 13, 2024, Xu wrote to one investor: "I think our term[s] will be very similar to this [Second Opportunity Term Sheet] **except I do not want to give revenue share with Harbour in case of a sublicense. This is not in Cytokali's interest**." (Emphasis added.)  In short, he understood the conflict between Harbour's interests and Kali's interests and deliberately chose to advance the interests of Kali, to the detriment of Harbour.

46.     Although as the licensor in the newco deal model, Harbour would be a necessary party to any term sheet or negotiated deal (as it was known to all potential investors that the Assets were required for the new business and a pre-condition for financing the newco), Xu sought to minimize Harbour's role and financial interests. None of this is consistent with Xu's duty of working solely for the benefit of Harbour.

### 4.     Further Covert Activities Relating to Kali

47.     With the Co-Lead Investor A Term Sheet in place, Xu continued to seek investments in Kali. On or around March 19, 2024, another investor, ███████████████ ("Co-Lead Investor B"), confirmed to Xu that it would like to co-lead the Kali deal together with Co-Lead Investor A.

48.     After securing the two co-lead investors, Xu moved forward in his efforts to legitimize Kali. On March 21, 2024**,** without Harbour's knowledge or consent, Xu secretly incorporated Kali Therapeutics, Inc. ("Kali") in Delaware.  Tellingly, as a full-time employee of Harbour, Xu did not use the Harbour legal department or its outside lawyers, as an employee normally would do when forming a legitimate corporate subsidiary or incubated newco for the company.

49.     Xu also secretly created Kali email accounts for himself and two other Harbour employees, Katherine "Kaytee" Bock Zafereo, who was at that time the Senior Vice President, Finance, of Harbour's business unit in the United States, and Kedan Lin, who was at that time

Harbor's Senior Vice President of Operations in the United States. Again, this was done without alerting the Harbour IT department because it was part of Xu's covert plan.

50.     Xu then forwarded emails from Harbour to his Kali email account, some of which contained Harbour's confidential and/or Proprietary Information (as defined in the NDA and Non-Competition Agreement) and were expressly marked "CONFIDENTIAL." He also forwarded these types of materials to his personal Gmail account. There was no legitimate business reason for Xu to use anything other than his Harbour email account, or for him to send Harbour emails, including Harbour's confidential and Proprietary Information, to any other account.

51.     On information and belief, on or about March 21, 2024, Xu, through Bock Zafereo, secretly registered those Kali email addresses (for Xu, Bock Zafereo and Lin) as administrators of Harbour's data room, which stored Harbour's confidential information relating to its Assets. Xu did not inform Harbour that he had granted administration rights for the data room to Kali or obtain Harbour's consent to do so.

### 5.     The *Partial* Disclosure to Harbour

52.     After Xu completed the key steps in his scheme as illustrated above, on or around March 22, 2024, Xu informed the CEO and others at Harbour that (i) the potential investors who were interested in the Assets asked Xu to represent the newco (*i.e.*, Kali) in negotiations with Harbour; and (ii) Harbour needed to assign someone to negotiate the deal on behalf of Harbour while he (Xu) represented Kali/the investors. Xu then pressed for Harbour to hurriedly approve the transaction, pointing to the investors' alleged impatience: "The window of opportunity is extreme narrow. Investors' patience is also running low."

53.     Without knowing all of the background and communications with the potential investors that already happened, Harbour proceeded to engage in initial discussions with Xu.

54.     A few days later, Xu seemed to sense Harbour's concerns about his conflict of interests as a result of the proposed transaction structure. On March 25, 2024, Xu proclaimed his continued representation of Harbour's interests, writing to the CEO of Harbour and others:

"Despite perceived 'conflict of interest' from Harbour's internal view, I as CBO of Harbour am still doing my best to negotiate a best deal on behalf of Harbour against investors. So anything I am presenting here is in the interest of Harbour's benefits deeply in mind as well."

55.     Xu successfully led Harbor to believe that he would and could still represent Harbour's interests, failing to disclose that he had already formed Kali as the newco that he would control, and in which he would have an equity interest. (He also failed to disclose that he had already signed the Co-Lead Investor A Term Sheet in relation to the Assets, which effectively limited any purported negotiations with Harbour in relation to the same assets.)

### 6.     The Stock Purchase Agreement and Solicitation

56.     Xu's wrongful conduct continued. On March 26, 2024, Xu signed a Restricted Stock Purchase Agreement with Kali, securing his own equity interest in the newco.  This was not disclosed to Harbour at the time.

57.     On information and belief, Xu then sent employment offer letters to Harbour employees Bock Zafereo and Lin, soliciting them to leave Harbour and join Kali. The offers were to be effective on the date of the closing of a deal that provided funding to Kali.

58.     Harbour had no knowledge of these offers or that its employees were being solicited by Xu to leave Harbour.

### 7.     The Negotiations with Harbour and the April 21, 2024 Term Sheet

59.     On April 1, 2024, Xu sent Harbour his official draft term sheet, and on April 21, Nona Biosciences ("Nona", Harbour's wholly owned subsidiary) and Kali signed a term sheet ("4/21 Term Sheet") together with Co-Lead Investor A and Co-Lead Investor B.

60.     The 4/21 Term Sheet granted Kali exclusive rights and certain other rights to research, develop, manufacture and commercialize the licensed Assets in certain areas, including in the United States.

61.     The 4/21 Term Sheet was not nearly as favorable to Harbour as the Second Opportunity Term Sheet. Compared to the Second Opportunity Term Sheet, which included an upfront payment of ███████ for only one asset ███████ the 4/21 Term Sheet's upfront

payment was only ███████ for multiple Assets. Both term sheets also included subsequent payments due at various clinical/regulatory and commercial milestones, but those totaled only ███████ for ██████ in the 4/21 Term Sheet[3], compared to ████████ in the Second Opportunity Term Sheet for the same asset. Both term sheets included ████████ ███████ and as with the other terms, the 4/21 Term Sheet was much less favorable than the Second Opportunity Term Sheet.[4]

62.     Thus, even though he contributed none of the licensed Assets or any of the funding for the newco, under this scheme, Xu would have a 6% equity interest in the newco and additional valuable stock options, all of which was still unknown to Harbour at that time. Based on the valuation assumptions, Xu's 6% equity interest in Kali would have been worth ███████.

63.     After the 4/21 Term Sheet was signed, Xu then negotiated proposed final agreements on behalf of Kali and its investors. To accelerate his plan and further eliminate Harbour's increasing internal doubts about his double role, on April 23, Xu wrote to the broader Harbour deal team from his Harbour email account: "Whatever the project team needs to accomplish is still for the interest of Harbour/Nona to maximize the value of this program...Deal terms can be negotiated but project progress is not negotiable. This email shall serve the purpose ONCE FOR ALL and ON THE RECORD that everyone on this email chain is still one team. We are still together to get things done." (Emphasis provided by Xu.)

64.     He also continued to lure other investors to join his syndicate of preferred investors. When the deal was nearing a closing in June 2024, there were nine investors/potential shareholders in Kali in the syndicate, ready to invest a total of ██████.

---

[3] The 4/21 Term Sheet also included clinical/regulatory and commercial milestones for other assets, totaling ██████.

[4] Sublicensing allows the licensee to grant some or all of those licensed rights to a third party. This allows the parties to explore alternative ways to advance a product or technology, either simultaneously or when the licensee is unable to further develop licensed products. In some arrangements, the licensee shares the revenue it receives from the third party with original licensor (referred to as a "sublicensing revenue sharing mechanism").

65. Xu misled Harbour in the negotiations regarding the 4/21 Term Sheet and deal documents in several ways, including as follows:

      a. Xu led Harbour to believe that the 4/21 Term Sheet represented the best terms that could be obtained for the Assets and that Harbour should agree to the terms therein, never disclosing that he had effectively terminated a more lucrative potential deal with Second Opportunity, and possibly others, weeks earlier.

      b. In order to induce Harbour to agree to a lower upfront payment for its Assets, Xu told Harbour that another biotech company was selling its similar assets at an upfront cost of only ██████. In or around September 2024, Harbour learned from ████████ ██████████that the upfront payment was ████████

      c. Xu originally assured Harbour that, under his plan, it would have a seat on the board of the newco (Kali). But he had already agreed with the co-lead investors that Kali would have only three board directors—the two co-lead investors would appoint one each, and he would be the third. Xu then told Harbour that the investors would not allow Harbour to have a seat on the board.

66. Harbour attempted to negotiate better deal terms for the Assets not knowing that Xu had already agreed with the investors on the financial terms to Harbour. In those undisclosed negotiations, Xu reduced the upfront payment to Harbour ███████████████ ██████████████████████; while at the same time, increasing his own equity interest in Kali ██████████████.

67. In order to induce Harbour to close on the deal, Xu continued to downplay the value of the Assets in communications to Harbour, while failing to pass on positive news that he received from investors.

68.     Harbour's deal team, lacking prior knowledge of the Co-Lead Investor A Term Sheet and a clear understanding of the market's valuation of the Assets, needed some time to digest the information provided by Xu.  But as Harbour expressed a need for more time, Xu created a false sense of urgency, seeking to force Harbour to quickly accept what he had proposed and allegedly negotiated.

69.     When that did not result in an acceleration of Harbour's progress to confirm the deal, Xu began to verbally attack employees at Harbour that were working on the deal in communications to them and to the CEO of Harbour.

70.     Xu's attacks and pressure campaign to close the deal only increased Harbour's concerns that there were irregularities in the process that Xu had followed.  Those concerns further escalated when Xu began to make unusual demands in late May 2024 about the press release that would be issued about the deal.

71.     For a company like Harbour, the press release relating to a transaction like the one being contemplated is a critical step in the process. As a public company, Harbour is required to ensure that the wording of such a press release is accurate, as it is relied upon by Harbour's public investors.  The press release also presents an opportunity for a licensor, such as Harbour, to tout the interest that reputable investors have in Harbour's research and technology.

72.     Xu began to push back on Harbour's draft of the press release and stated that Kali's investors absolutely did not want Harbour to identify their names in the press release. He falsely stated that the investors did not wish to be identified by or associated with Harbour and further advocated that Kali issue its own press release without mentioning Harbour.

73.     The protestations on the press release raised further red flags, and Harbour's concerns that Xu was not acting in good faith became ever more heightened.

74.     Harbour has since learned that Xu's representation that the Kali investors did not wish to be identified in a Harbour-issue press release was false. The press release issues further underscore that Xu was driven not by the investors' desires, but by his desire to grab the

headlines for his newly-created company (*i.e.*, Kali), which he envisioned would have an entirely separate identity from Harbour, rather than an incubated newco of Harbour.

**E.     Xu's Termination from Harbour and its Post-Termination Investigation**

75.     On June 4, 2024, in light of Harbour's increasing conflicts of interest and on suspicion of Xu's potential misconduct, Harbour terminated Xu's employment, with June 7, 2024 as Xu's last working day.

76.     Xu's emails have since been reviewed, notwithstanding his attempts to cover his tracks by deleting certain emails from his Harbour email account.  Xu's emails reveal that Xu's plan all along was not to advance Harbour's interest in order to maximize the value of its Assets, but instead to create a new company in which he would own an equity interest and that he would control, to then lure Harbour's employees to work for that company, all while reluctantly offering nominal and minimal participation to Harbour in the CytoKali/Kali deal, and in the deal's communications with various potential investors.

77.     Subsequent to the filing of the initial Complaint, Harbour discovered that Xu sought reimbursement for expenses that he claimed were incurred on Harbour's behalf, but instead were incurred for the benefit of Kali and/or for Xu's own self-dealing.

78.     For example, when Xu attended the Bio International Convention June 3-6, 2024 in San Diego, California, Xu registered his attendance as being associated with Kali Therapeutics, but then submitted reimbursement requests for that event to Harbour.

79.     Harbour was unaware of Xu's conduct as it pertains to his self-dealing and actions that conflicted with the best interests of Harbour at the times it reimbursed Xu for the expenses that he submitted to the Company.  It is now clear to Harbour that many of the expenses for which it reimbursed Xu were incurred by Xu in connection with conduct that was intended to advance his self-interest, to the detriment of Harbour.

**F.     Current Status and Harbour's Damages**

80.     Based on its conclusion that Xu's misconduct and extensive self-dealing permeated the entire negotiations surrounding the 4/21 Term Sheet, and although the agreements

were finalized and the investors in Kali were ready to close the deal, on June 27, 2024, Harbour was required to notify the investors that Harbour was unable to proceed with the transaction.

81.     The abrupt termination of the transaction, while unavoidable because of Xu's extensive self-dealing, caused great harm to Harbour's reputation. The fact that one of its officers had engaged in such conduct, resulting in an important transaction being terminated under these circumstances has, on information and belief, caused other investors to question Harbour's integrity.

82.     The full extent of Harbour's damages from Xu's improper conduct continue to be investigated, but it is clear that, at a minimum, Xu has caused damage to Harbour relating to the following:

       a.     opportunities to benefit from exclusively licensing and/or investing in Harbour's Assets on terms and at prices that were not tainted by Xu's self-interest in an amount well in excess of $75,000;

       b.     the benefits of Xu's promised exclusive work for Harbour, in the amount of at least his annual salary and benefits which exceeds $75,000;

       c.     the exclusive work of two senior employees who were actively collaborating with Xu, in the amount of at least their annual salaries and benefits, which each exceed $75,000;

       d.     the reimbursements made to Xu for his improper expense submissions that were for the benefit of Kali and/or Xu's own self-dealing, but not for the benefit of Harbour, in an amount to be determined at trial; and

       e.     expenses (including legal fees) incurred by Harbour related to the 4/21 Term Sheet, negotiations, and potential deal closing.

83.     Harbour may also have been harmed by:

       a.     Xu's disclosure of Harbour's confidential information and/or Harbour's plans and strategies for its Assets;

b.      Xu's ongoing competition with Harbour via Kali Therapeutics; and

c.      damage to Harbour's reputation due to Xu's improper conduct.

## First Cause of Action

### Breach of Fiduciary Duties - Duty of Loyalty

84.      Harbour re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

85.      As an employee, Xu owed, at a minimum, a duty of loyalty to Harbour during his employment.

86.      Xu was also an officer of Harbour until his termination, and as an officer, he owed additional and more robust fiduciary duties to the company, including an obligation to give Harbour his undivided loyalty, barring him from using his position of trust and confidence to further his own interests.

87.      Xu's fiduciary duties to Harbour also commanded that he affirmatively protect the interests of the company committed to his charge and refrain from doing anything that would work injury to Harbour or to deprive it of any profit or advantage.

88.      Xu breached his fiduciary duties, including his duty of loyalty, by engaging the conduct alleged above while employed by Harbour.

89.      Xu also breached his fiduciary duties by:

a.      promoting his own interests in a manner injurious to Harbour;

b.      taking corporate opportunities for his own benefit;

c.      failing to inform Harbour of available business opportunities;

d.      rejecting corporate business opportunities to advance his own interests;

e.      soliciting, encouraging and/or assisting other employees of Harbour in breaching their fiduciary and/or contractual duties to Harbour;

f.      submitting expense reimbursement requests to Harbour that were incurred for the benefit of Kali and/or for Xu's own self-dealing; and

g.      misrepresenting material facts regarding Harbour's business opportunities.

90.     As a direct and proximate result of his breaches, Harbour has suffered damages in excess of $75,000, with the exact amount to be proven at trial.

## Second Cause of Action

## Breach of Contract

91.     Harbour re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

92.     Xu was an employee of Harbour and subject to certain employment contracts.

93.     Specifically, in consideration of his employment with Harbour, Xu signed an employment offer letter that was a valid and enforceable contract.

94.     In consideration of his employment with Harbour, Xu also signed an NDA and Non-Competition Agreement, which is a valid and enforceable contract.

95.     Harbour performed all duties as required under the employment contracts except to the extent those duties were excused or waived.

96.     Xu breached his contractual duties by not "devot[ing] [his] full time and effort to the business and affairs of the Company," and by, among other things:

a.      directly or indirectly, as an officer, director, employee, consultant, stockholder, member, owner partner, or in any other capacity, competing with the business or anticipated business of Harbour;

b.      directly or indirectly, as an officer, director, employee, consultant, stockholder, member, owner partner, or in any other capacity, taking steps or actions to facilitate or prepare for competition with the business or anticipated business of Harbour; and

c.      assisting other people and/or entities to compete with the business or anticipated business of Harbour and/or taking steps or actions to prepare for competition with Harbour.

97.     Xu also breached the duty of good faith and fair dealing that is implied in all contracts, by among other things, violating the reasonable expectations of Harbour concerning the Xu's obligations under the contracts.

98.     As a direct and proximate result of Xu's breaches, Harbour has suffered damages in an amount to be proven at trial.

### Third Cause of Action

### Interference with Advantageous Economic Relationships

99.     Harbour re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

100.     Harbour had advantageous prospective business relationships with contractors and potential investors regarding its new business venture and its Assets, which were likely to provide economic benefit to Harbour.

101.     Xu knowingly and improperly interfered with those prospective business relationships by and through his actions outlined above.

102.     Xu's interference with Harbour's business relationships was improper because, among other things, he was diverting business opportunities from his employer for his own benefit.  Xu's actions were not in furtherance of any legitimate corporate interest for Harbour, to whom he owed a duty of loyalty and other contractual duties as detailed above.

103.     Xu's actions disrupted Harbour's prospective business relationships.

104.     Xu's actions diverted the economic benefits that Harbour anticipated receiving from its prospective business relationships.

105.     Xu's actions also made it more difficult and/or expensive for Harbour to realize the economic benefits from those prospective business relationships.

106.     Xu knew and or should have known that his actions would disrupt and/or divert the economic benefit expected from Harbour's prospective business relationships.

107.     Xu intended that his actions would disrupt and/or divert the economic benefit expected from Harbour's prospective business relationships.

108.    Harbour suffered damages as a direct and proximate cause of Xu's interference with Harbour's prospective business relationships.  Those damages exceed $75,000, with the exact amount to be proven at trial.

### Fourth Cause of Action

### Fraud

109.    Harbour re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

110.    Xu made false representations of material fact to Harbour as alleged above.

111.    Xu knew that the representations made to Harbour were false.

112.    Xu made false representations of material fact to Harbour for the purpose of inducing Harbour to act or refrain from acting based on those representations.

113.    Xu made false representations of material fact to Harbour with the expectation that Harbour would act or refrain from acting based on those representations.

114.    Xu intended that Harbour would rely on his false representations.

115.    Harbour reasonably and justifiably relied on the representations of Xu, to its detriment.

116.    Xu also failed to disclose material facts to Harbour as alleged above.

117.    Xu had a duty to disclose these material facts to Harbour because Xu owed fiduciary duties to Harbour as an officer and pursuant to his contractual agreements.

118.    Xu knew that the information he withheld from Harbour was necessary to prevent his other representations to Harbour from being misleading.

119.    The material information that Xu withheld from Harbour related to the essence of the transactions at issue.

120.    Harbour suffered damages as a direct and proximate cause of Xu's fraudulent representations and omissions.  Those damages exceed $75,000, with the exact amount to be proven at trial.

## Fifth Cause of Action

## Violation of the Defend Trade Secrets Act

## (18 U.S.C. § 1836, et seq.)

121.    Harbour re-alleges and incorporates all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

122.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., gives owners of trade secrets a legal right to file a lawsuit in federal court when their trade secrets have been stolen or misappropriated. 18 U.S.C. § 1836(b).

123.    Under the DTSA a "trade secret" includes all forms any types of financial, business, technical, economic, or engineering information including plans, compilations, designs, methods, techniques, processes, procedures, programs, or codes, etc., whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if the information derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information and the owner of the trade secret has taken reasonable measures to keep such information secret. 18 U.S.C. § 1839(3).

124.    Under the DTSA, misappropriation occurs when the trade secret has been disclosed or used without express or implied consent by a person who knew or had reason to know that the knowledge of the trade secret arose under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to maintain its secrecy or limit its use. 18 U.S.C. § 1839(5).

125.    Harbour maintains documents and data relating to its research and development ("R&D") and business plans for licensing or otherwise monetizing the R&D ("Business Plans and Prospects") that are used in interstate and foreign commerce. The R&D includes technical data, testing, and protocols all related to advances that Harbour's scientists have made in therapies for treating cancer patients and other applications. The Business Plans and Prospects

include contact information for the key decisionmakers at various companies, information on their levels of interests, and prospects for entering into licensing or other agreements for the R&D. Harbour has taken all proper and reasonable measures to keep its R&D and Business Plans and Prospects secret.

126. The Business Plans and Prospects and R&D are trade secrets, integral to Harbour's business and having great independent economic and commercial value to Harbour from not being generally known or readily ascertainable through proper means to others in the industry that could benefit from them. Business Plans and Prospects and R&D are collectively referred to herein as "Harbour's Trade Secrets." Xu knew that Harbour's trade secrets should be maintained in a confidential manner, and Xu expressly agreed to do so in the contracts he signed with Harbour.

127. Xu misappropriated the Trade Secrets by wrongfully accessing and forwarding the Trade Secrets to his personal email and the email addresses he created to compete with Harbour without Harbour's permission and, on information and belief, Xu used and/or is using the Trade Secrets without Harbour's permission, all of which is the direct and proximate cause of damage to Harbour.

128. Xu took the actions alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Harbour, and acted with an improper and evil motive amounting to malice and in conscious disregard of Harbour's rights.

129. Because Xu's acts taken towards Harbour were carried out in a shameless, despicable, deliberate and intentional manner in order to injure and damage Harbour while gaining a competitive advantage for Xu's own benefit, Harbour is entitled to recover compensatory and exemplary damages in an amount to be proven at trial, as well as statutory penalties.

130. Xu's conduct has irreparably harmed Harbour, including harm to its reputation and standing in the marketplace, and Harbour is entitled to injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, HBM Holdings Limited, Harbour Antibodies U.S. Inc., and Harbour BioMed (Shanghai) Co., Ltd. pray that this Court enter judgment in their favor and against Defendant Weihao Xu on all causes of action, including damages that may be proven at trial and grant such further relief that the Court deems just, proper, and equitable.

Respectfully submitted this 10th day of May, 2025,

/s/ _Angela E. Dralle_____
Christopher Karagheuzoff (BBO No. 630123)
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10021
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
karagheuzoff.christopher@dorsey.com

Kent J. Schmidt (admitted *pro hac vice*)
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Telephone: (714) 800-1400
schmidt.kent@dorsey.com

Angela E. Dralle (admitted *pro hac vice*)
DORSEY & WHITNEY LLP
801 Grand Ave., Suite 4100
Des Moines, IA 50309
Telephone: (515) 283-1000
dralle.angela@dorsey.com

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was filed through the CM/ECF system and will be electronically sent to the registered participants as identified on the Notice of Electronic Filing (NEF) on this May 10, 2025.

_/s/ Angela E. Dralle__
Attorney for Plaintiffs